UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JASON RAPPAPORT,

                              Plaintiff,

              -against-

GUARDIAN LIFE INSURANCE COMPANY OF
AMERICA,

                              Defendant.

Case No. 1:22-cv-08100 (JLR)

**<u>OPINION AND ORDER</u>**

---

JENNIFER L. ROCHON, United States District Judge:

This litigation arises from a dispute between Plaintiff Jason Rappaport ("Rappaport"), the beneficiary of a long-term disability benefits plan ("the Plan"), and Defendant Guardian Life Insurance Company of America ("Guardian") about whether his disability benefits were improperly terminated in 2021.  In 2015, following his diagnosis with leukemia, Rappaport applied for and received long-term disability ("LTD") benefits.  His benefits were terminated in January 2021 when Guardian informed Rappaport he no longer qualified for benefits because he was capable of earning more than the maximum permitted under the Plan. Following the denial of his administrative appeal to Guardian, Rappaport brought this suit.

Rappaport contends in Count I of his Amended Complaint that Guardian improperly terminated his LTD benefits based on his earning capability because Guardian erroneously excluded his K-1 earnings from its calculation of his "insured earnings."  In the alternative, in Count II, he seeks reformation of the Plan to include bonuses and commissions (and thus K-1 earnings) in the Plan's definition of insured earnings.  Guardian maintains that it correctly calculated insured earnings and appropriately terminated Rappaport's benefits; it further contends that reformation would be improper.  Guardian initially asserted two counterclaims,

but only one counterclaim, seeking set off of overpayments from any future benefit payments, remains.

Although there are various legal theories and claims in this case, the parties agree that the central question that the Court must resolve is whether the term "insured earnings," as used in the Plan, includes Rappaport's K-1 earnings from his position at Industrial Credit of Canada d/b/a ICC Mortgage Services ("ICC"). For the following reasons, the Court finds that it does.

## FINDINGS OF FACT[1]

The Court's findings of fact are contained in this section, but are also integrated in its conclusions of law because some findings are more clearly described in the legal context in which they must be evaluated.

### I.    The Parties

In 1994, Rappaport and Dean Sourial, his business partner, formed ICC. Stip. ¶ 1. Rappaport was a 50% owner of ICC. Stip. ¶ 2. Rappaport worked as a licensed mortgage banker at ICC; he also served as its Secretary and Treasurer. Stip. ¶¶ 3-4. As an owner of ICC, Rappaport was paid a salary set forth in his annual W-2 wage and tax statement and earnings reflected in a Schedule K-1 each year. Dkt. 89-1 ("Rapp. Aff.") ¶ 4. His nonpassive K-1 earnings consisted of Rappaport's portion of the partnership profits that were paid to him periodically throughout the year. Rapp. Aff. ¶¶ 5-6; App'x 1071; Tr. 23:23-24:3, 25:3-25 (explaining that K-1 earnings were paid as "profits for someone who owns a company" and

---

[1] Citations to "PX" refer to a plaintiff exhibit; "DX" to a defense exhibit; "App'x" to the administrative record; "Stip." to the parties' stipulated facts, Dkt. 112-1; and "Tr." to the oral argument transcript from April 1, 2025, Dkt. 139-1.

were paid "based on the amount of money that was coming into ICC"); *see also* App'x 1072, 1076.  ICC closed in 2017.  Tr. 49:8-12, 89:8-12.

Guardian is an insurance company and, as relevant here, is the Plan's claims administrator.  Stip. ¶ 8.

## II.    ICC Obtains Insurance Coverage from Guardian

In or about 2004 or 2005, ICC applied for a group disability insurance policy from Guardian through ICC's insurance broker, Jay Greenbaum.  Stip. ¶¶ 5-6.  ICC obtained a policy from Guardian that funded LTD benefits and covered two classes of employees: (1) Class 1 for business owners and managers and (2) Class 2 for all other eligible employees. Stip. ¶¶ 7, 10.

In its plan application, Guardian offered several earnings definitions, including "W-2 definition," "Standard definition including bonuses and commissions," and "Standard definition excluding bonuses and commissions."  App'x 6407.  ICC selected the "[s]tandard [earnings] definition *including* bonuses and commissions."  App'x 6407 (emphasis added); Stip. ¶ 13.  The administrative record contains a Guardian policy proposal for ICC dated December 29, 2004, that lists the pre-disability earnings definition as "standard, *excluding* bonuses and commissions."  App'x 5610-11 (emphasis added).  However, undated handwritten notes on the document reflect that someone has crossed out "excluding" and written "including" instead.  App'x 5611.

On March 8, 2005, Guardian Processing Underwriter Specialist Anna Keiper emailed Greenbaum to confirm various details of ICC's application, including the insured-earnings definition.  Stip. ¶ 14; App'x 5595.  Specifically, she stated the "master app has including bonus and comm and quote has excluding bonus and comm."  App'x 5595.  Greenbaum

emailed her back the same day, confirming that ICC requested an earnings definition "INCLUD[ING]" bonuses and commissions.  App'x 5539; Stip. ¶ 15.

Notwithstanding the foregoing, Guardian ultimately issued the LTD policy with an earnings definition that excluded bonuses and commissions.  Stip. ¶¶ 17, 19, 23.  The policy's insured-earnings definition read in part:

> *Insured earnings* includes your contributions deposited into a cash or deferred compensation plan, or salary reduction plan, qualified under IRC Section 401(k), 403(b) or 457.  Earnings based on excluded income and *employer* contributions deposited into such 401(k), 403(b) or 457 plan are excluded.
>
> For all covered persons, <u>*insured earnings* means your rate of monthly earnings, excluding bonuses, commissions, expense accounts, and any other extra compensation</u>, as reported by the *plan sponsor*.

App'x 86 (underlining added for emphasis).

On March 14, 2005, Guardian wrote Rappaport directly, thanking him for selecting Guardian "as [his] group insurance carrier."  Stip. ¶ 24 (quoting App'x 5366).  The letter advised that Guardian was "currently preparing the materials [Rappaport] will need to administer [his] plan."  Stip. ¶ 24 (quoting App'x 5366).  On April 13, 2005, Guardian sent Rappaport an initial billing statement detailing the premiums to be paid.  Stip. ¶ 25; *see* App'x 5356.  Guardian has not identified any evidence that ICC was sent a full copy of the Plan at this time, and Rappaport has sworn that Guardian never sent him "a copy of the full LTD Policy or any other documents stating the definition of Insured Earnings that Guardian used," Rapp. Aff. ¶ 13.

### III.    Rappaport Applies for Benefits

About ten years later, on or about July 14, 2015, Rappaport began working part time due to severe symptoms from polycythemia vera, a debilitating form of leukemia.  Dkt. 89-1; Rapp. Aff. ¶¶ 19-20; Stip. ¶ 27; App'x 298.  On August 17, 2015, Rappaport informed

Guardian that he was unable to work full time and had reduced his work hours.  Stip. ¶ 27.

Rappaport applied for LTD benefits on September 15, 2015.  Stip. ¶ 28.  His application

included an employer statement and the payroll records that Guardian requested.  Stip. ¶ 28;

App'x 568-82.  The payroll records listed Rappaport's monthly salary as $18,333 in February

and March 2015.  *See, e.g.*, App'x 711-12.  Guardian initially denied LTD benefits on

December 29, 2015, concluding that the medical evidence did not support Rappaport's

restrictions.  App'x 126, 809.  Rappaport appealed the adverse benefits determination on June

7, 2016.  App'x 809.  On July 21, 2016, Guardian informed Rappaport that it had "completed

[its] review of [his] appeal request," and found that the medical documentation supported his

disability.  App'x 1182.  Guardian "referred [Rappaport's] file to [its] Claims Department for

further assessment of his eligibility for benefits."  App'x 1182.  In connection with this further

review, Rappaport submitted his 2015 tax returns on August 22, 2016, and again on

September 6, 2016, including his Schedule K-1 form for 2015.  *See* App'x 1074-121, 1129.

On September 12, 2016, while further assessment was ongoing, Guardian

representative Tara Bauman emailed Rappaport's counsel with "a few additional questions . . .

regarding how Dr. Rappaport is paid," including asking whether Rappaport was paid by ICC

"on a W-2 or as a shareholder," and "[w]hat determined his salary . . . [d]id he have a set

salary or was it based off of the [company's] earnings/profit?"  App'x 1072.  Rappaport's

counsel replied on September 15, 2016, explaining that "his salary was calculated based on

*both salary and Profits*," that Rappaport "received W-2 every year," and that Rappaport had

already provided his K-1s, W-2s, and tax returns through 2015.  App'x 1071 (emphasis

added); *see also* App'x 1074 (attaching tax returns); App'x 1076-121 (2015 tax returns,

including 2015 Schedule K-1 form for ICC listing Rappaport's ordinary business income as

$617,394); App'x 1129 (August 22, 2016 letter from Rappaport's counsel to Guardian attaching "2015 Tax Returns, inclusive of K-1").

On September 21, 2016, Guardian informed Rappaport that it had determined that LTD benefits were payable and calculated his insured earnings, as defined by the Plan, as $18,333.33 per month.  Stip. ¶¶ 29-30; *see* App'x 1066.  Guardian began paying Rappaport the maximum LTD benefit of $10,000 per month, effective October 13, 2015, and paid that maximum monthly benefit through August 2020.  Stip. ¶¶ 31-32.

## IV.    Guardian Terminates Rappaport's Benefits

On August 11, 2020, Guardian informed Rappaport that it was terminating his LTD benefits because it had not received ongoing proof of claim, namely, forms from his medical provider.  Stip. ¶ 61; App'x 2662-66.  In an email dated August 13, 2020, Rappaport's counsel explained that he was in the process of acquiring outstanding information from Rappaport's medical provider but that there were complications with obtaining the records given the COVID-19 pandemic.  App'x 2662.  Guardian denied Rappaport's request to reopen the claim.  Stip. ¶¶ 62-63.

On December 21, 2020, Rappaport submitted the outstanding medical records to Guardian.  Stip. ¶ 64; App'x 2586.  On January 5, 2021, Guardian informed Rappaport that it was "working on reopening the Long Term Disability claim" for Rappaport, but that records for "all 2020 earnings" were still outstanding.  Stip. ¶ 65 (quoting App'x 2544-45).  The same day, Rappaport's attorney informed Guardian that she would gather the 2020 earnings and submit them.  Stip. ¶ 66.  On January 10, 2021, Rappaport submitted his 2019 and 2020 earning statements.  Stip. ¶ 69; *see* App'x 2461-542.

On January 22, 2021, Guardian informed Rappaport that it had determined he no longer qualified for disability payments because, as of January 2019, he was "capable of

earning more than the maximum allowed while disabled," that is, "greater than 80% of [his] indexed [i]nsured [e]arnings."  Stip. ¶ 72; App'x 2854-55.  Moreover, Guardian stated that it determined that it had overpaid Rappaport by $326,889.05 based on its recalculation of his earnings while disabled, and requested reimbursement of that amount by March 7, 2021. App'x 2855.

## V.    Administrative Review

On January 29, 2021, Rappaport requested an "opportunity to review the documents relied upon by Guardian in denying his claim."  Stip. ¶ 73.  Guardian sent Rappaport documents in response to his request on February 26, 2021.  Stip. ¶ 75.  Rappaport followed up with Guardian on April 26, 2021, writing that Guardian had not "include[d] any materials that predate August 17, 2015, . . . communications with Mr. Rappaport's employer, [or] . . . the information [Guardian] relied on when determining Mr. Rappaport's 'insured earnings' or 'indexed insured earnings.'"  Stip. ¶ 76 (quoting App'x 2831).  Rappaport requested that information, as well as all communications between him and Guardian.  Stip. ¶ 77; App'x 2832.  After Rappaport's counsel reached out several times, Guardian's appeals case manager, Leslie Lisicky, responded on July 16, 2021, but did not send the requested information.  Stip. ¶¶ 78-82.  Rappaport's counsel followed up on July 29, July 30, and August 12, 2021, reiterating his request for production of materials in Guardian's records that predated Rappaport's claim for benefits.  Stip. ¶¶ 83-85.  Rappaport requested, and Guardian granted, extensions of the appeal deadline through March 25, 2022.  Stip. ¶¶ 86-87.

On March 25, 2022, Rappaport appealed Guardian's adverse benefits determination. Stip. ¶ 88.  Under ERISA regulations, Guardian had 45 days to review Rappaport's appeal. Stip. ¶ 91.  On May 6, 2022, Guardian wrote a letter to Rappaport acknowledging that the 45-day review period would expire on May 9, 2022, and stating that it had determined that

additional financial review "in regard to the financial information" was necessary as part of its review. Stip. ¶¶ 91-92; App'x 5545. Guardian also advised that it was "asserting [its] right to take an additional extension (at least 45 days if needed) to issue a determination on this matter," which would expire on June 23, 2022. App'x 5545.

On May 12, 2022, Lisicky emailed the manager of group underwriting, Dharma Seda, with a question about the Plan's insured-earnings definition for Class 1 officers. App'x 5557-58. Lisicky explained that she "need[ed] to confirm the Plan has the correct earnings definition," since the "earnings definition d[id] not appear to be appropriate for the way [the insured] w[as] paid," but "[i]f the insured earnings definition is not correct and his earnings were determined incorrectly, then he was not earning over 80%." App'x 5551-52. Since underwriting did not have any documentation, App'x 5549-51, Lisicky contacted Keiper for "additional insight," App'x 5548. Keiper told Lisicky that based on her review of the information Lisicky sent, "the earnings def for class 1 should have been *including* B&C [bonuses and commissions]." App'x 5547 (emphasis added).

On June 17, 2022, Guardian requested an additional 45-day extension to issue a decision on Rappaport's appeal. Stip. ¶ 98. On June 21, 2022, Rappaport's counsel sent Guardian the requested W-2s for 2016, 2017, 2018, and 2020, as well as tax records for ICC and Sierra Holdings, LLC, an entity that Rappaport partially owned. App'x 4865-66; Stip. ¶¶ 99-100. He also informed Guardian that Rappaport objected to its request for an extension to complete its review. Stip. ¶ 101.

On June 23, 2022, Guardian informed Rappaport by letter that it had upheld its earlier claim determination. Stip. ¶ 103. The following day, Rappaport requested additional documentation from Guardian and, on July 7, 2022, Guardian sent more than 60 pages of

documents related to the 2004-2005 policy negotiations and purchase of the LTD Plan.  Stip.
¶¶ 105-106.

## VI.    Procedural History

On September 22, 2022, Rappaport filed this ERISA action against Guardian.  Dkt. 1
("Compl.").  He sought recovery of unpaid LTD benefits under section 502(a)(1)(B) of
ERISA, 29 U.S.C. § 1132(a)(1)(B); an alternative remedy of reformation of the Plan so that
"insured earnings" would include bonuses and commissions under section 502(a)(3), *id.*
§ 1132(a)(3); and attorney's fees and costs under section 502(g)(1), *id.* § 1132(g)(1).
Compl. ¶¶ 114-141.  On December 23, 2022, Guardian moved to stay the case and to remand
the claim for further administrative proceedings, "in part so Guardian could complete its
review of underwriting documentation."  Stip. ¶ 109; *see* Dkt. 15.  The Court granted
Guardian's motion to remand the case to permit the further review.  Dkt. 25.

After continued review, Guardian upheld its prior determination and held that the
earnings definition excluded bonuses and commissions.  Stip. ¶ 114.  On March 31, 2023,
Rappaport moved to reopen the case.  Dkt. 28.  On April 13, 2023, the Court granted
Rappaport's motion to reopen the case, Dkt. 30, and Rappaport filed an Amended Complaint
the following day, Dkt. 31 ("AC").  Rappaport amended his Complaint to include allegations
that Guardian had not reviewed the insured-earnings formula on remand, AC ¶¶ 111-132, and
to provide more detail regarding his claim for reformation, *id.* ¶¶ 154-155, 164.

Following discovery, the parties cross-moved for partial summary judgment on
January 5, 2024.  Dkts. 74, 75, 76, 81.  In an opinion and order dated November 22, 2024, the
Court denied Guardian's motion for partial summary judgment, and granted Rappaport's
cross-motion for partial summary judgment in part and denied it in part.  *See generally*
*Rappaport v. Guardian Life Ins. Co. of Am.*, No. 22-cv-08100 (JLR), 2024 WL 4872736

9

(S.D.N.Y. Nov. 22, 2024) (*Rappaport I*).  As relevant here, the Court held that a *de novo* standard applied to its review of the merits of Count I, Rappaport's denial-of-benefits claim, and that Rappaport's reformation claim in Count II was not time barred.  *See id.* at *5-6, *13-14.  It also held that Rappaport had adequately pleaded his reformation claim and that genuine disputes of material fact prevented it from granting Guardian's motion for summary judgment on Count II.  *See id.* at *7-9.  Finally, the Court entered summary judgment in favor of Rappaport as to Guardian's first counterclaim for restitution and denied Rappaport's motion for summary judgment as to Guardian's second counterclaim for set off.  *Id.* at *15-17.

On January 3, 2025, the parties informed the Court that they consented to a bench trial on the stipulated record.  Dkt. 112 at 2-3; *see also* Dkt. 113.  They submitted a joint pretrial order, their joint stipulation of facts, and the deposition testimony of Dewey Yeatts and Matthew Tobin.  Dkts. 112, 112-1 to 112-3.  On February 21, 2025, the parties submitted pretrial memoranda and proposed findings of fact and conclusions of law.  Dkt. 116 ("Df. Br."); Dkt. 117 (Guardian's Proposed Findings of Fact and Conclusions of Law); Dkt. 124 (Rappaport's Proposed Findings of Fact and Conclusions of Law); Dkt. 125 ("Pl. Br.").  On March 21, 2025, the parties submitted responses to the pretrial memoranda and Guardian submitted a response to Rappaport's proposed findings of fact and conclusions of law.  Dkt. 133 ("Pl. Resp."); Dkt. 134 ("Df. Resp."); Dkt. 135 (Guardian Response to Rappaport's Proposed Findings of Fact and Conclusions of Law).  On April 1, 2025, the Court heard several hours of closing statements/oral argument from the parties; the parties also confirmed they did not intend to present any live witness testimony and that the Court should rule based on the record presented, Tr. 102:9-103:16.  On April 4, 2025, Guardian submitted proposed deposition counter-designations for Tobin and Yeatts, in the event that the Court considered the deposition testimony.  Dkt. 138.

## CONCLUSIONS OF LAW

### I.    Review of Benefits Determination (Count I)

The parties agree that the Court's resolution of Count I turns on whether the Plan's insured-earnings definition included or excluded Rappaport's K-1 earnings.  *See* Pl. Resp. at 6-19; Df. Br. at 23-25; Tr. 11:7-12, 47:17-25.  For the reasons that follow, the Court concludes that the Plan's insured-earnings definition included Rappaport's K-1 earnings and that Guardian's benefits denial was erroneous because it did not apply this more inclusive insured-earnings definition.

### A.  The Standard of Review is *De Novo*

As set forth in *Rappaport I*, the Court reviews Guardian's decision to deny benefits *de novo*.  2024 WL 4872736, at *14.  In applying *de novo* review, the Court reviews "all aspects of the denial [of the claim], including fact issues," *Kintsler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 245 (2d Cir. 1999), "to determine for itself whether the claimant should be granted or denied the requested relief," *Elsroth v. Con. Edison Co. of N.Y.*, 10 F. Supp. 2d 427, 434 (S.D.N.Y. 1998) (citing *DeFelice v. Am. Int'l Life Assurance Co. of N.Y.*, 112 F.3d 61, 65 (2d Cir. 1997)).  *See also Lijoi v. Cont'l Cas. Co.*, 414 F. Supp. 2d 228, 238 (E.D.N.Y. 2006) (same).  "[T]he Court 'stands in the shoes of the original decisionmaker, interprets the terms of the benefits plan, determines the proper diagnostic criteria, reviews the medical evidence, and reaches its own conclusion about whether the plaintiff has shown, by a preponderance of the evidence, that she is entitled to benefits under the plan.'"  *Tretola v. First Unum Life Ins. Co.*, No. 13-cv-00231 (PAE), 2014 WL 2815586, at *2 (S.D.N.Y. June

23, 2014) (quoting *McDonnell v. First Unum Life Ins. Co.*, No. 10-cv-08140 (RPP), 2013 WL 3975941, at *12 (S.D.N.Y. Aug. 5, 2013)).[2]

### B. Plan Interpretation

The parties primarily dispute what income should be included in "insured earnings" under the Plan. *See* App'x 86. For that reason, the Court begins its review of Guardian's benefits determination with the Plan's language.

In reviewing an issue of plan interpretation *de novo*, "the court will construe the terms of an ERISA plan according to federal common law." *Mullally v. First Reliance Standard Life Ins. Co.*, 253 F. Supp. 2d 279, 282 (D. Conn. 2003) (citing *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002)). The Court "may look to state law," though it may "use state common law as the basis of the federal common law only if the state law is consistent with the policies underlying [ERISA]." *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004) (quoting *Krishna v. Colgate Palmolive Co.*, 7 F.3d 11, 14 (2d Cir. 1993)). The Court "'interpret[]s ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience.' If there are ambiguities in the language of an insurance policy that is part of an ERISA plan, they are to be construed against the insurer" on *de novo* review. *Critchlow*, 378 F.3d at 256 (citations omitted) (quoting *Todd v. AIG Life Ins. Co.*, 47

---

[2] Guardian suggests that to prevail, Rappaport must "show that Guardian's claim determinations were unreasonable, unsupported by substantial evidence, or erroneous applications of the terms of the Plan." Df. Br. at 21. But this reflects the arbitrary and capricious standard of review, not *de novo* review. *See Rappaport I*, 2024 WL 4872736, at *10 (explaining that "'[i]f the arbitrary and capricious standard applies, the scope of review is 'narrow,'" and "[d]enials may be overturned . . . only if the decision is *without reason*, *unsupported by substantial evidence* or *erroneous as a matter of law*" (emphases added) (quoting *S.M. v. Oxford Health Plans (N.Y.), Inc.*, 94 F. Supp. 3d 481, 508 (S.D.N.Y. 2015), *aff'd*, 644 F. App'x 81 (2d Cir. 2016) (summary order))). Guardian cites no case suggesting that the Court should import this deferential standard into its *de novo* review, and the Court rejects its invitation to do so.

F.3d 1448, 1452 n.1 (5th Cir. 1995)) (collecting cases); *see also Tyll v. Stanley Black & Decker Life Ins. Program*, 403 F. Supp. 3d 27, 32 (D. Conn. 2019) (similar).  "Language in a plan 'is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire . . . agreement.'" *Critchlow*, 378 F.3d at 256 (quoting *Fay*, 287 F.3d at 104).  Where language is "unambiguous," the Court "interpret[s] and enforce[s] [it] according to its 'plain meaning.'" *Aramony v. United Way of Am.*, 254 F.3d 403, 412 (2d Cir. 2001) (quoting *Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 149 (2d Cir. 1999)).

    *1.  Plain Language*

The Plan defines "insured earnings" as follows:

> *Insured earnings* includes your contributions deposited into a cash or deferred compensation plan, or salary reduction plan, qualified under IRC Section 401(k), 403(b) or 457.  Earnings based on excluded income and *employer* contributions deposited into such 401(k), 403(b) or 457 plan are excluded.

> For all covered persons, <u>*insured earnings* means your rate of monthly earnings, excluding bonuses, commissions, expense accounts, and any other extra compensation, as reported by the *plan sponsor*</u>.  If you are paid hourly, we calculate monthly earnings based on actual hours worked or billed in the two months before the start of your *disability*.  We do not include pay for hours worked or billed over 40 per week.

App'x 86 (underlining added).  "[R]ate of monthly earnings," "bonuses," "commissions," "expense accounts," and "extra compensation" are not defined.  Guardian argues that "insured earnings" include only Rappaport's wages reported on his W-2, while Rappaport contends that the term includes his K-1 earnings from ICC as well.

The Court begins with the central term: earnings.  "Earnings" is a broad term, encompassing not just one's salary or wages, but also "[r]evenue gained from labor or services, from the investment of capital, or from assets."  *Earnings*, *Black's Law Dictionary* (12th ed. 2024); *see Deegan v. Cont'l Cas. Co.*, 167 F.3d 502, 507 (9th Cir. 1999) (explaining

that the plain meaning of "earnings" encompasses more than wages); *Keszenheimer v. Reliance Standard Life Ins. Co.*, 402 F.3d 504, 508-09 (5th Cir. 2005) (noting that "earnings is a broader term than salary" (internal quotation marks omitted)); Tr. 55:14-18 (Guardian: "Monthly earnings is a substantially larger term, a broader term than [payroll]."). Partners and owners of companies are frequently paid through K-1 earnings, that is, distributions of a company's profits that are reflected on a Schedule K-1 tax form; W-2 tax forms, which do not include K-1 earnings, often do not capture significant sources of income for partners or owners of a business. *See* Tr. 25:13-24, 71:11-15; *Wernimot v. Unum Life Ins. Co. of Am.*, No. 09-cv-00768, 2010 WL 5015508, at *5 (W.D. Mich. Dec. 3, 2010) (defendant insurer acknowledged that "W-2 income may not be the best indicator of overall compensation, especially for such employees as [p]laintiff, who earns a significant portion of his income from sources unreported on a W-2," but that were recorded on a Schedule K-1); *Unum Life Ins. Co. of Am. v. Epes*, 715 F. Supp. 2d 837, 843 n.22 (E.D. Ark. 2010) (explaining that "[a]s a partner in a law firm," the insured's "basic monthly earnings" were his "net earnings (loss) from self-employment from schedule K-1 of the partnership federal income tax return" for the prior year (internal quotation marks omitted)). As a result, the plain meaning of the term "earnings" naturally includes K-1 earnings for partners and owners — especially where, as here, the Class 1 LTD benefits purchased were expressly for the owners or partners of the company. *See* App'x 58 (Plan issued for "Class 0001"); Stip. ¶¶ 7, 10 (class 1 covered business owners and managers); *see also* App'x 5387 (proposed schedule of benefits for "Owners & Bus. Mgr[s].""); App'x 6406 (plan application listing "class 1 — owners & business mgrs." and "class 2 — all other employees").

Guardian's argument that K-1 earnings are not included in the Plan definition because the Plan does not expressly mention them is unpersuasive. *See* Df. Br. at 24. The Plan's

language makes *no* mention of the particular type of earnings that fall under "monthly

earnings." *See* App'x 86. Instead, it specifies only categories of compensation *excluded* from

the rate of monthly earnings: as relevant here, "bonuses, commissions, . . . and any other

extra compensation[.]" *Id.* Though the Plan does not define these terms, their ordinary

meaning illustrates that they are inapplicable to Rappaport's K-1 earnings from ICC. First,

"bonuses" are commonly understood as "[a] premium paid in addition to what is due or

expected," *Bonus*, *Black's Law Dictionary* (12th ed. 2024), and they are usually "given in

addition to an employee's usual compensation," *Bonus*, *Merriam-Webster*,

https://www.merriam-webster.com/dictionary/bonus [perma.cc/5T2B-N3W5].

"Commissions" are similarly divorced from an employee's regular compensation. *Black's*

*Law Dictionary* defines "commissions" as "[a] fee paid to an agent or employee for a

particular transaction, [usually] as a percentage of the money received from the transaction."

*Commission*, *Black's Law Dictionary* (12th ed. 2024). Extra, too, means "more than is due,

usual, or necessary." *Extra*, *Merriam-Webster*, https://www.merriam-

webster.com/dictionary/extra [https://perma.cc/7NN7-6PAM]. Therefore, all three exclusions

refer to compensation that is greater than an employee's regular, expected, non-transaction-

based means of compensation. *See Rothstein v. Am. Int'l Grp.*, 837 F.3d 195, 210 (2d Cir.

2016) (interpreting ERISA plan term based on the meaning of the surrounding terms). By

contrast, Rappaport's K-1 income was part of his regular nondiscretionary partnership income

that he received by virtue of his ownership interest in ICC, and distributions were paid

frequently throughout the year. *See* Rapp. Aff. ¶¶ 4-5; App'x 1071 (counsel for Rappaport

stating to Guardian in 2016 that Rappaport's salary was calculated based on "both salary and

Profits"); App'x 1076 (Rappaport's 2015 schedule K-1 form for ICC). Such income was not

discretionary, like a bonus, or dependent on a particular sale or action by Rappaport, as a

commission would be.  It was not extra compensation beyond that which he was ordinarily due.  Thus, the Court concludes that K-1 earnings do not fall within the scope of the exclusions set forth in the earnings definition.

Guardian argues that because insured earnings refers to "monthly earnings" only Rappaport's monthly W-2 wages from ICC are included.  Df. Br. at 24.  The Court does not agree.  First, the Plan does not refer just to "earnings" — it refers to the insured's "rate of monthly earnings."  App'x 86.  "Rate," though defined in the Plan, commonly means "[p]roportional or relative value."  *Rate*, *Black's Law Dictionary* (12th ed. 2024).  Since "rate" modifies "monthly earnings," it indicates that "insured earnings" means the insured's average monthly earnings, and not only earnings that are paid on a monthly basis.  The Court thus declines Guardian's invitation to read "rate" out of the Plan.  *See Am. Fed'n of Musicians v. Atl. Recording Corp.*, 203 F. Supp. 3d 301, 310 (S.D.N.Y. 2016) ("[I]t is 'basic contract law' that 'an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible.'" (quoting *Unique Woodworking, Inc. v. N.Y.C. Dist. Council of Carpenters' Pension Fund*, No. 07-cv-01951 (WCC), 2007 WL 4267632, at *6 (S.D.N.Y. Nov. 30, 2007))).  Therefore, Rappaport's rate of monthly earnings would be determined by dividing his yearly earnings — which would include his W-2 income and his regular K-1 partnership income — by twelve.  *See* App'x 5598, 5639.

*Jantos v. Prudential Life Insurance Co. of America,* No. 15-cv-01530, 2019 WL 1294827 (W.D. Wash. Mar. 21, 2019), is also instructive.  In *Jantos*, the insurer similarly argued that K-1 earnings should not be included in the "monthly earnings" calculation "because it was not paid out monthly.'"  *Id.* at *5.  The court rejected this argument, reasoning that "[u]nder Defendant's literal interpretation, any income that is not paid strictly on a

'monthly' basis would be excluded," potentially excluding the insured's "salary, which is paid biweekly, leaving [the insured] with theoretically no 'monthly earnings.'" *Id.* The Court agrees with this analysis. Thus, even if the Plan at issue here did not use the word "rate" to modify monthly earnings, the Court would still find that K-1 earnings are included in monthly earnings regardless of whether they are paid monthly

Therefore, based on the Plan's plain language, the Court concludes that Rappaport's K-1 income unambiguously falls within the ambit of the Plan's insured-earnings definition.

### 2. Extrinsic Evidence

Even if the Plan language was ambiguous, extrinsic evidence supports the Court's finding that ICC and Guardian intended "insured earnings" to encompass Rappaport's K-1 income from ICC. "Review of extrinsic evidence may include looking to 'negotiations . . . made prior to or contemporaneous with the execution of a written contract which may tend to vary or contradict its terms.'" *Volt Elec. NYC Corp. v. A.M.E., Inc.*, 586 F. Supp. 3d 262, 277 (S.D.N.Y. 2022) (omission in original) (quoting *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 571 (2d Cir. 1991)). In addition, "[c]ourts have deemed parties' course of performance as the 'best evidence of the intent of the parties to a contract,' finding that such post-contract conduct is 'highly probative of [the parties'] state of mind at the time the contract was signed.'" *Trireme Energy Holdings, Inc. v. RWE Renewables Ams., LLC*, --- F. Supp. 3d ---, 2024 WL 4825975, at *29 (S.D.N.Y. Nov. 19, 2024) (alteration in original) (quoting *China Privatization Fund (Del.), L.P. v. Galaxy Ent. Grp. Ltd.*, 135 N.Y.S.3d 18, 20 (App. Div. 2020)).[3]

---

[3] Guardian argues that the Court's review is "limited to the four corners of the applicable plan document." Df. Resp. at 14. But the only in-Circuit case Guardian cites for this proposition, *Feifer v. Prudential Insurance Co. of America*, explained that "where the language of a

First, ICC's application for insurance reflects that the insured-earnings definition was not limited to W-2 wages. "[I]n interpreting a contract, a court may look to all the relevant circumstances surrounding the transaction, including the prior negotiations." *Trireme*, 2024 WL 4825975, at *33 (alteration in original) (internal quotation marks omitted). The Guardian policy application that ICC filled out provided six choices for "Earnings Definition for LTD": (1) "[s]tandard definition excluding bonuses and commissions," (2) "[s]tandard definition including bonuses," (3) "[s]tandard definition including commissions," (4) "[s]tandard definition including bonuses and commissions, (5) "*W-2 definition*," and (6) "[o]ther." App'x 5587 (emphasis added). The fact that the application included an option to include W-2 earnings only — and it is undisputed that ICC did not select it — undermines Guardian's argument that "monthly earnings" covers W-2 earnings only.

Second, evidence of ICC's payment structure for its owners supports a conclusion that K-1 income is included in insured earnings. The Plan defines insured earnings as the "rate of monthly earnings . . . as reported by the plan sponsor." App'x 86 (emphasis omitted). When ICC, the plan sponsor, applied for coverage in 2005, it reported the earnings of its employees through a census report. App'x 5590, 5598. ICC's submission in 2005 reported Rappaport's

---

contract is *unambiguous*, the parties' intent is determined within the four corners of the contract, without reference to external evidence." 306 F.3d 1202, 1210 (2d Cir. 2002) (citing *United States v. Liranzo*, 944 F.2d 73, 77 (2d Cir. 1991)). Where the language of the contract is ambiguous, the Court's review is not so limited, and it may turn to sources other than the Plan's language. *See Kinek v. Paramount Commc'ns, Inc.*, 22 F.3d 503, 509 (2d Cir. 1994) ("Extrinsic evidence regarding the parties' intent is relevant, however, only if the contract is ambiguous." (citing *Sanchez v. Maher*, 560 F.2d 1105, 1108 (2d Cir. 1977))); *Kascewicz v. Citibank, N.A.*, 837 F. Supp. 1312, 1317 (S.D.N.Y. 1993) (citing *Curry Rd. Ltd. v. K Mart Corp.*, 893 F.2d 509, 511 (2d Cir. 1990)); *Gilbert v. Related Mgmt. Co.*, 162 F.3d 1147, at *1-2 (2d Cir. 1998) (summary order) (approving district court's decision to refer to plan manual and insurance enrollment form to resolve ambiguity in plan language). Indeed, Guardian itself points the Court to extrinsic evidence (in particular, its census statistics) in arguing for its interpretation of the Plan's language. *See, e.g.*, Tr. 54:2-21, 55:7-18.

total annual earnings as $500,000, which included both his W-2 wages and K-1 income.
App'x 5598; *see* Pl. Br. at 22. If the parties understood that "insured earnings" meant only
W-2 earnings, there would be no reason for ICC to have reported this higher number for
Rappaport's earnings. The Court finds that this evidence supports that the parties intended
that K-1 earnings were included in the earnings definition.

Third, Guardian's internal documents when it issued the Plan reflect the parties'
understanding that K-1 earnings were included in the rate of monthly earnings. When ICC
submitted its employee census, Guardian used that information to calculate two key categories
of income for ICC's employees: "covered payroll," which the parties agree included only W-2
income, and "monthly earnings." App'x 5401; *see* Tr. 54:13-21 (Guardian: covered payroll
was W-2 income). ICC had three Class I male employees in 2005: Rappaport, Sourial, and an
unidentified third employee. *See* App'x 5401. The census statistics reported that ICC's three
male employees had a "covered payroll" of $82,569.99, while their "monthly earnings"
totaled $136,736.56. App'x 5401. The Court agrees with Rappaport that the delta between
covered payroll and monthly earnings is attributable to K-1 earnings, since the difference
between the two amounts multiplied by twelve produces an amount roughly equal to the
amount Rappaport and Sourial earned through ICC's K-1 earnings the prior year.[4] Therefore,
internal Guardian census reports reflect that ICC, the plan sponsor, reported income for

---

[4] Specifically, the difference between monthly earnings and covered payroll is $54,166.67.
This monthly amount, multiplied by twelve, totals $650,000.04. Rappaport's K-1 earnings in
2004 totaled $300,000. App'x 5598. The remaining non-W-2 earnings are $350,000.04,
$300,000 of which can be attributed to Sourial since ICC's two owners equally split the
earnings from the company. The remaining $50,000 represents the third, unnamed male ICC
employee's annual salary, which was likely $250,000. *See* App'x 5631 (listing three
employees as "Owners & Bus. Mgr."); *id.* at 5642 (handwritten note on ICC census report: "3
ees [employees] in class 1 all meet the $10,000 max"); *id.* (handwritten note on ICC census
report listing class 1 employee earnings total as "$1,250,000").

Rappaport that included his K-1 earnings, and that his income, along with the W-2 salary, was designated by Guardian internally as "monthly earnings." App'x 5401, 5639. This designation of "monthly earnings" corresponds more naturally to the insured-earnings definition that references "rate of monthly earnings" instead of the "covered payroll," a term that is nowhere referenced in the Plan. Thus, Guardian's internal census statistics support the Court's conclusion that the parties intended and understood the earnings definition to include K-1 earnings.

Fourth, Rappaport's financial submissions to ICC in 2015, when he applied for benefits, also confirm ICC and Guardian's intent to include K-1 earnings.[5] When Rappaport initially applied for benefits in 2015, he submitted his monthly payroll at Guardian's request. App'x 551 (October 2, 2015 letter from Guardian requesting "[p]ayroll records from 2/2/15 – 3/1/15"); *id.* at 806 (similar request on November 6, 2015); *id.* at 711-12 (Rappaport's salary submission for February and March 2015). Rappaport thereafter submitted additional earnings information, including records of his K-1 earnings from ICC. *See* App'x 1129-75 (submitting, in August 2016, "2015 Tax Returns, inclusive of K-1"). In September 2016, a Guardian representative contacted Rappaport's counsel to confirm whether Rappaport had "a set salary," or whether it was "based off of the companies? [*sic*] earnings/profit?" *Id.* at 1071-72. Rappaport's attorney confirmed that "[p]rior to his disability, [Rappaport's] salary was calculated based on *both salary and Profits*" and that Rappaport had already provided his K-1s, W-2s, and tax returns through 2015. *Id.* at 1071 (emphasis added); *see also id.* at 1074 (attaching tax returns); *id.* at 1076-1121 (2015 tax returns, including 2015 Schedule K-1 form from ICC listing Rappaport's ordinary business income as $617,394); *id.* at 1129 (August 22,

---

[5] While ICC, not Rappaport, was party to the Plan, Rappaport was the Secretary and Treasurer of ICC.

2016 letter from Rappaport's counsel to Guardian attaching "2015 Tax Returns, inclusive of K-1"). This conduct likewise indicates that ICC and Guardian intended to include K-1 earnings "as reported by the plan sponsor" in insured earnings.

Fifth, Guardian's internal documents that were produced outside the administrative record also indicate that insured earnings included K-1 earnings. Before discussing the import of these documents, however, the Court must address the parties' dispute about whether the Court can consider them. During discovery, Guardian produced internal manuals used by its employees to code benefits that apply to specific claims, as well as a document explaining differences between the AG2000 plan — the Plan ICC procured — and the AG2009 plan, which the manuals describe. Dkt. 112-2 at 57:4-15; *see* PX A; PX D; Tr. 29:4-20, 32:9-33:2. The Second Circuit has held that "upon a *de novo* review of issues of plan interpretation," "a district court may consider evidence outside the administrative record," *Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 293 (2d Cir. 2004) (citing *Masella v. Blue Cross & Blue Shield of Conn., Inc.*, 936 F.2d 98, 103-05 (2d Cir. 1991)), that is "relevant to plan interpretation," *Masella*, 936 F.2d at 104. During oral argument, Guardian also conceded that the Court could consider the manual evidence if it was relevant. Tr. 65:1-4, 66:6-12.[6] The Court finds the

_____

[6] In their papers, the parties debate whether the manuals and the comparison document would be admissible under the good-cause standard, under which district courts may "consider evidence outside the administrative record upon a de novo review *of factual issues*," *Salisbury v. Prudential Life Ins. Co. of Am.*, 238 F. Supp. 3d 444, 451 (S.D.N.Y. 2017) (quoting *Locher*, 389 F.3d at 293-94). The Court finds that the manuals and comparison document would also properly be admissible under the good-cause standard. The Second Circuit has recognized that good cause can be demonstrated by, among other things, a showing that "the administrator was not disinterested," *Locher*, 389 F.3d at 294 (quoting *DeFelice*, 112 F.3d at 66), or that a "plan's failure to comply with the claims-procedure regulation adversely affected the development of the administrative record," *Halo v. Yale Health Plan*, 819 F.3d 42, 60 (2d Cir. 2016). Here, Guardian's conflict as both evaluator of claims and payor of benefits, *see Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112-13 (2008), combined with Guardian's failure to comply with repeated document requests in violation of ERISA claims-

manuals relevant to interpreting the Plan's language since they shed light on the treatment of K-1 income for purposes of determining Rappaport's insured earnings. Under the heading "Earnings Definition," the manuals state that "Partner/Shareholder earnings and K-1 earnings are embedded into all of Guardian's earnings definitions." PX A at 10; *see, e.g.*, *id.* at 65, 95, 125. This is true not only for the earnings definition for which ICC applied — the "standard definition including bonuses and commissions" — it is also true for the insured-earnings definition that was issued to ICC, which excludes bonuses and commissions. *See id.* at 10. While, as Rappaport acknowledges, the manuals refer to the 2009 Guardian policy form (AG2009), which was issued after the ICC policy in 2005, the manuals still support the notion that "insured earnings" in the earlier policy form (AG2000) included K-1 earnings. The manual in place for the AG2000 policy was not produced by Guardian. But PX D, a document produced by Guardian that summarizes changes between the AG2000 policy and the new AG2009 policy, does not indicate any changes to "embed[ing]" K-1 earnings into all earnings definitions and instead only sets forth fewer earnings definitions. PX D at 14. This indicates that including K-1 earnings in insured earnings was not a new development in the AG 2009 plan and, in fact, applies to the Plan issued to ICC.[7]

---

procedure regulations, *see* 29 C.F.R. § 2560.503-1(h)(2)(iii), (m)(8)(i); App'x 2813-14, 5330-31, sufficiently supports a showing of good cause to admit the manuals and plan comparison document.

Rappaport has also asked the Court to consider ICC's bank records and deposition testimony, *see* Pl. Br. at 15, 18-19; and Guardian has counter-designated excerpts from Yeatts's and Tobin's deposition testimony in the event that the Court considers their testimony, *see* Dkt. 138. The Court has not relied on this information and therefore does not reach whether it is relevant to plan interpretation or could be considered under a good-cause standard.

[7] Rappaport submitted these documents under seal pursuant to Guardian's request, *see* Dkts. 126, 127, but contends that Guardian has not made a showing sufficient to overcome the presumption in favor of public access to judicial documents, *see* Dkt. 126 at 1. The Court

The Court is not persuaded by the extrinsic evidence Guardian proffers in favor of its more restrictive reading of the insured-earnings definition. Guardian argues that it calculated premiums using "covered payroll" based only on W-2 earnings. Tr. 54:2-21, 55:7-18; *see also* Df. Br. at 24, 27-28. While premiums may have been calculated based on "covered payroll," that does not bear on the definition of "rate of monthly earnings" given that "covered payroll" does not appear in the insured-earnings definition or anywhere in the policy, in contrast to the phrase "monthly earnings," which included the K-1 earnings in the census statistics, and is also used in the Plan definition of "rate of monthly earnings."

Guardian next relies on the letter it sent Rappaport in September 2016 informing him that his insured earnings had been calculated as $18,333 — an amount that concededly excluded K-1 earnings — and that Rappaport did not object. *See* Df. Br. 12, 21; CX 1 at 5; Tr. 79:1-5. In light of the fact that the letter confirmed that Rappaport would be receiving the maximum LTD benefit regardless of whether the K-1 earnings were included or not, the Court does not find Rappaport's failure to object to be persuasive evidence of the parties' intent. Even if this letter does present conflicting evidence of Guardian's understanding of the income included in "insured earnings," it does not outweigh the other extrinsic evidence or, more importantly, the plain language of the policy for purposes of whether Rappaport has

---

temporarily granted the motion to seal pending its resolution of the issues presented by this bench trial, Dkt. 131, and will grant the motion to seal in part and deny it in part. Judicial documents are filed items that are "relevant to the performance of the judicial function and useful in the judicial process," *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995)), and "[s]uch documents are presumptively public,'" *Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 139 (2d Cir. 2016). The Court relies on only a small excerpt from these documents and the remainder is inapplicable to the matter before this Court. The Court will unseal only the portions it relies upon — by reference to those portions in this opinion — and will maintain the other portions of the exhibits under seal since they are internal confidential business records of Guardian that are not relevant to the Court's analysis.

proven his claim by a preponderance of the evidence. And finally, given all of the other evidence, this letter at most supports an ambiguity, and ambiguity should be construed against the insurer under the rule of *contra proferentum*. *See Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 279 (2d Cir. 2000) (explaining that "[w]here extrinsic evidence is conclusory or does not shed light upon the intent of the parties, a court may resort to the contra proferentum rule of contract construction and construe any ambiguities in the contract against the insurer" (citation omitted)); *Critchlow*, 378 F.3d at 256 ("If there are ambiguities in the language of an insurance policy that is part of an ERISA plan, they are to be construed against the insurer.").

Thus, the Court finds that the plain language of the policy and the overwhelming majority of the extrinsic evidence shows that the parties intended the Plan's insured-earnings definition to encompass Rappaport's K-1 earnings from ICC, not W-2 earnings only.

## II.    Reformation (Count II)

In the alternative, Rappaport asks the Court to reform the Plan to include bonuses and commissions if it finds that the Plan's existing insured-earnings definition excludes K-1 earnings. *See* AC ¶ 163; Pl. Br. at 27-30. The Court agrees that even if "rate of monthly earnings" did not include Rappaport's K-1 earnings because such earnings were bonuses, commissions, or extra earnings, those earnings should still be included in insured earnings because the policy should be reformed to reflect the most expansive definition of insured earnings.

### A.  Legal Standard

Under ERISA, a district court may grant reformation "due to the mutual mistake of both parties, or where one party is mistaken and the other commits fraud or engages in inequitable conduct." *Amara v. CIGNA Corp.*, 775 F.3d 510, 525 (2d Cir. 2014) (citing

*Simmons Creek Coal Co. v. Doran*, 142 U.S. 417, 435 (1892)); *see also Rappaport I*, 2024 WL 4872736, at *7. ERISA also "authorizes district courts to grant equitable relief — including reformation — to remedy violations of subsection I of ERISA, even in the absence of mistake, fraud, or other conduct traditionally considered to be inequitable," *Laurent v. PricewaterhouseCoopers LLP*, 945 F.3d 739, 748 (2d Cir. 2019), namely, where the "written terms of a . . . plan indisputably violate ERISA," *id.* at 747. *Accord Caban v. N.Y.C. Dist. Council of Carpenters Pension Plan*, No. 19-cv-06205 (JGK), 2020 WL 5774901, at *5 (S.D.N.Y. Sept. 28, 2020). To prove mistake, "a plaintiff must show by clear and convincing evidence that 'a party entered a contract "in ignorance or mistake of facts material to its operation."'" *Osberg v. Foot Locker, Inc.*, 862 F.3d 198, 213 (2d Cir. 2017) (quoting *Amara*, 775 F.3d at 529). The Court may consider evidence outside the four corners of the Plan in evaluating Rappaport's claim for reformation. *See Manley v. AmBase Corp.*, 126 F. Supp. 2d 743, 754 (S.D.N.Y. 2001) ("Because the thrust of a reformation claim is that the writing does not set forth the actual agreement of the parties, the parol evidence rule generally does not apply to bar proof of the claimed agreement between the parties.").

### B. Reformation Is Appropriate

The Court holds that reformation is appropriate here because Rappaport has shown mutual mistake by clear and convincing evidence. Mutual mistake "involves a belief of both parties to a contract 'that is not in accord with the facts,'" and "[t]he mistaken or erroneous belief 'must relate to the facts as they exist at the time of the making of the contract.'" *Anita Founds. Inc. v. ILGWU Nat'l Ret. Fund*, 710 F. Supp. 983, 986 (S.D.N.Y. 1989) (quoting *Restatement (Second) of Contracts* § 151 (1981)), *aff'd*, 902 F.2d 185 (2d Cir. 1990); *see also Keane v. Zitomer Pharm., Inc.*, No. 06-cv-05981 (RJS) (KNF), 2010 WL 624285, at *5 (S.D.N.Y. Feb. 23, 2010) (mutual mistake "requires a showing that 'both parties . . . shared

the same erroneous belief as to a material fact'" (omission in original) (quoting *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 46 (2d Cir. 1991))).  Mutual mistake exists "when the parties, although sharing an identical intent when they formed a written document, did not express that intent in the document."  27 *Williston on Contracts* § 70:13 (4th ed. 2024).

At the time of the creation of the Plan, clear and convincing evidence indicates that ICC and Guardian shared the intent that the policy would be written to include bonuses and commissions.  The plan application "is usually given great weight" in "establishing what the parties intended," as is "any language in or notation on the policy that explicitly addresses the very subject in which the alleged mistake occurs."  2 *Couch on Insurance* § 28.18 (3d ed. 2024).  It is undisputed that ICC's plan application sought an insured-earnings definition that included bonuses and commissions.  *See* App'x 6407; Stip. ¶ 13.  Greenbaum, ICC's broker, confirmed ICC's selection of an insured-earnings definition that included bonuses and commissions when Keiper, a Guardian Underwriting Specialist, expressly sought confirmation on this point.  App'x 5593, 5595.  Guardian's plan proposals likewise reflect this election: handwritten notes on a plan proposal dated December 29, 2024, show that someone at Guardian crossed out "excluding" and wrote "including."  *Id.* at 5611.  The notes on the internal Guardian document, combined with ICC's application and Greenbaum's communications directly with a Guardian representative to confirm this election, clearly indicate an intent by both parties to include bonuses and commissions in the insured-earnings definition.

Other than pointing to the ultimate policy language that mistakenly does not contain "including bonuses and commissions," Guardian has not identified any evidence in the record, despite searching, where the parties agreed to a definition that excluded bonuses and

commissions.[8]  Rather, all the evidence in the record demonstrates that ICC consistently expressed its intent to procure an earnings definition that included bonuses and commissions and that Guardian knew and confirmed that election.  Reformation of the Plan's language, which did not ultimately reflect that mutual agreement, is therefore appropriate.  *See Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 820-21 (7th Cir. 2010) (holding that "drafting mistake" in plan document warranted equitable reformation of the plan to remove the error); *Gen. Dynamics Corp. v. United States*, 47 Fed. Cl. 514, 529 (2000) (explaining that reformation may remedy "mistakes in expression, as in the case of the omission of an agreed-upon term, or the inclusion of a term not agreed upon or the incorrect reduction of a term to writing"); *Restatement (Second) of Contracts* § 155 illus. 2 (1979) (If A and B come to terms on a sale agreement, and in reducing the agreement to writing B mistakenly changes a contract term and A fails to notice the error, the court will reform the agreement at the request of either party); 66 Am. Jur. 2d *Reformation of Instruments* § 20 (2025) ("[W]hen there is a mutuality of assent but the resulting document intended to express that such agreement fails to do so by reason of the mistake of the drafter, it is immaterial . . . whether one of the parties is the drafter; the real concern is whether the document expresses the agreement." (footnote omitted)).

Indeed, Guardian's review during the administrative appeal confirms ICC and Guardian's agreement to use an earnings definition "including" bonuses and commissions. During the 2022 administrative appeal process, Keiper, the Guardian employee who

---

[8] During the appeals process, Lisicky emailed the manager of underwriting at Guardian to ask whether underwriting had any documentation explaining the difference between the earnings definition ICC selected and the earnings definition in the Plan.  *See* App'x 5550-51. Underwriting had no information other than the back and forth between Greenbaum and Keiper.  *See id.* at 5549.

communicated directly with Greenbaum about ICC's LTD benefits-plan application at the time the policy was placed, reviewed the documents surrounding plan formation, including her emails with Greenbaum, and explained that "[l]ooking through the information . . . I would believe the earnings def[inition] for class 1 [owners] should have been *including* B&C [bonuses and commissions]." App'x 5547-48 (emphasis added).  Guardian tries to downplay this assessment now, *see* Df. Resp. at 21-22, but this is difficult to square with the fact that Guardian's own appeals reviewer, Lisicky, found Keiper's viewpoint relevant in assessing the appeal, *see* App'x 5547-48.  This reinforces the Court's conclusion that ICC and Guardian agreed to the more expansive insured-earnings definition and that the policy should be reformed to reflect that.

Guardian argues there was no mutual mistake because Rappaport easily could have discovered the alleged mistake when ICC was first notified of the Plan's terms or in September 2016, when Guardian informed Rappaport his insured earnings had been calculated as $18,333.  Df. Br. at 29-30; *see* Tr. 57:16-58:8.  Neither argument is persuasive to the Court.  First, Guardian has not identified record evidence indicating that Rappaport or ICC received or reviewed a copy of the Plan.  Indeed, neither of Guardian's 2005 communications with Rappaport "include[d] the policy itself, and Rappaport has sworn that Guardian never sent him 'a copy of the full LTD Policy or any other documents stating the definition of Insured Earnings that Guardian used.'"  *Rappaport I*, 2024 WL 4872736, at *6 (quoting Rapp. Aff. ¶ 13).  Even if Rappaport or ICC had received a copy of the Plan, "[t]he mere failure to read a contract and discover a mistake made in its preparation, even when a reading would have disclosed the error, does not bar an insured from seeking reformation of a contract entered into under mutual mistake by both parties."  27 *Williston on Contracts* § 70:26 (footnote omitted); *see also Amara v. CIGNA Corp.*, 925 F. Supp. 2d 242, 252 (D. Conn.

2012) (explaining that reformation is available "even if the complaining party was negligent in not realizing its mistake" (quoting *CIGNA Corp. v. Amara*, 563 U.S. 421, 443 (2011))), *aff'd*, 775 F.3d 510. In general, "reformation is not precluded by the fact that the insured has held the policy for some time without reading it even after a loss has occurred." 2 *Couch on Insurance* § 27:73 (footnote omitted).[9] Second, Rappaport's failure to object to the September 2016 insured-earnings notification does not disprove mutual mistake at the time of Plan formation in 2005. Guardian has cited no case to this Court indicating that a beneficiary's later conduct after the execution of the policy bears on the question of whether there was mutual mistake at the time of contracting, and the only potential relevance that Guardian cited at oral argument is that Rappaport's post-formation conduct bears on his credibility. Tr. 58:9-23; 79:7-18. Given all of the countervailing evidence at the time of the

---

[9] Guardian's argument that an insured's "duty to read the insurance policy or have it read to him or her" means Rappaport cannot "claim ignorance of policy terms" in support of his reformation claim is unpersuasive. Df. Br. at 31 (quoting *Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Carnival PLC*, No. 21-cv-10641 (PAC), 2022 WL 4467572, at *3 (S.D.N.Y. Sept. 26, 2022)). None of the cases that Guardian cites deal with situations where parties agreed upon provisions to an ERISA-governed policy that ultimately were not reflected in the policy or hold that failure to read such a policy to catch that mistake bars later reformation. In *American Steamship*, the court held that a company was bound by the terms of the cruise line vessel insurance that was entered into by a related chartered entity because it was on inquiry notice of the policy, which listed the company as a co-assured. 2022 WL 4467572, at *2-3. Such circumstances are unlike the present case where ICC and Guardian directly negotiated coverage terms that were later misrepresented in the ultimate policy. Further, in *Madsen v. Prudential Insurance Co. of America*, 35 N.Y.S.2d 607 (Sup. Ct. 1942), the court found that there was "no proof that there was an agreement between the applicant and the agent that the provision last mentioned was to be used when and if the policy issued; indeed, there is no proof that the applicant even knew that such a provision existed." *Id.* at 609. Here, it is clear that ICC knew of the contested insured-earnings definition and that the parties agreed upon it when the policy was placed. The *Madsen* court also referenced a potential "cause of action to have the policy rewritten," similar to the reformation claim here. *Id.* Finally, in *Minsker v. John Hancock Mutual Life Insurance Co.*, 173 N.E. 4 (N.Y. 1930), alleged misrepresentations by the insured were attached to a life insurance policy that the insured had a duty to read. *Id.* at 5. This is not akin to the circumstances here where the parties mutually confirmed information at the time of the policy formation that was mistakenly not reflected in the ultimate policy.

policy placement, and the fact that the September 2016 letter provided Rappaport with the maximum LTD benefits under the policy that would have been provided regardless of whether the earnings definition included or excluded bonuses and commissions, the Court does not agree with Guardian.  Thus, the September 2016 letter does not convince the Court that there has not been a mutual mistake.  Guardian's calculation of monthly premiums based on covered payroll that includes only W-2 income also does not persuade the Court that there was no mutual mistake at the time of policy placement.  As discussed, Guardian has not identified record evidence explaining the connection between covered payroll and "rate of monthly earnings," so the fact that it calculated premiums based on covered payroll does not shed light on whether Guardian was mistaken when it issued a policy that excluded bonuses and commissions in its insured-earnings definition.

Finally, the Court does not agree with Guardian that Rappaport is foreclosed from arguing that the reformed Plan includes K-1 earnings because he argued earlier that K-1 earnings do not qualify as bonuses, commissions, or extra compensation.  Tr. 48:1-12, 97:1-12; *see also* Df. Resp. at 19.  Rappaport presented arguments in the alternative, as he is entitled to do.  Thus, the Court's alternative holding is that even if K-1 earnings are considered bonuses, commissions, or extra compensation, Rappaport's K-1 earnings would still be included in his insured earnings under the reformed agreement.  Indeed, Guardian does not contest that if the insured-earnings definition "included" bonuses, commissions, and extra compensation, then Rappaport's K-1 income would be included in calculating that income given that this is the most expansive earnings definition set forth in the policy.

For all of these reasons, the Court finds that Rappaport has established by clear and convincing evidence a mutual mistake necessary to reform the Plan to provide that the definition of insured earnings includes, rather than excludes, bonuses, commissions, and extra

compensation.  S*ee Amara*, 775 F.3d at 526 ("The facts required to satisfy the elements of reformation must be proven by clear and convincing evidence.").

**III.    Remand and Attorneys' Fees**

While Rappaport previously indicated he was seeking damages for unpaid benefits from January 2021 to the present, *see* Dkt. 112 at 4, he clarified during oral argument that he only seeks a ruling that his K-1 earnings should have been included in insured earnings.  Tr. 10:1-10.  The parties agree that if the Court finds K-1 earnings are included in insured earnings, it should remand to Guardian to engage in a benefits determination based on an income and medical assessment.  *See id.* 100:2-101:24 (Rappaport and Guardian agreeing that if the Court "find[s] that K-1 earnings should have been included, then [it] will make that finding and [the parties] will," on remand, "determine . . . whether any benefits in the future are owed based on his income or disability assessment").  The parties also agree that if the Court finds that K-1 earnings are included, the Court should remand to Guardian to determine whether there were any overpayments for purposes of any potential set off.  *Id.* 100:2-12 (Rappaport agreeing that if the Court finds K-1 earnings should have been included in insured earnings, the parties would "go back and determine whether there were any overpayments"); *id.* 100:13-101:9 (Guardian confirming its position that if the Court finds K-1 earnings should have been included in insured earnings, it should remand to Guardian to determine "whether money is owed in the future" for purposes of set off).  Thus, the Court will remand to Guardian to determine the LTD benefits that are due to Rappaport if his K-1 earnings at ICC are included in his pre-disability insured earnings and to determine if any potential set off is appropriate.

As for Rappaport's claim for attorneys' fees, Guardian argued in its papers that Rappaport had waived his claim for fees by not raising it in his trial memorandum, Df. Resp.

at 28, but conceded at oral argument that Rappaport could later make an attorneys' fees application if he prevailed, Tr. 98:7-13. Thus, the Court will entertain Rappaport's future application for attorneys' fees.

## CONCLUSION

For the foregoing reasons, the Court finds that the Plan's insured-earnings definition includes Rappaport's K-1 earnings. The Court remands the case to Guardian to determine Rappaport's past and future LTD benefits in accordance with this finding. The parties are directed to provide a joint status letter to the Court by May 21, 2025, regarding the progress of the benefits redetermination. Rappaport shall submit any application for attorneys' fees by May 31, 2025. The Clerk of Court is respectfully directed to terminate the motion to seal at Dkt. 126.

Dated:  April 21, 2025
       New York, New York

SO ORDERED.

*Jennifer Rochon*

JENNIFER L. ROCHON
United States District Judge