UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JASON RAPPAPORT,

                              Plaintiff,

        -against-

GUARDIAN LIFE INSURANCE COMPANY OF
AMERICA,

                              Defendant.

Case No. 1:22-cv-08100 (JLR)

**<u>OPINION AND ORDER</u>**

JENNIFER L. ROCHON, United States District Judge:

        This litigation arises from a dispute between Plaintiff Jason Rappaport ("Rappaport"),
the beneficiary of a long-term disability ("LTD") benefits plan (the "Plan"), and Defendant
Guardian Life Insurance Company of America ("Guardian") about whether Rappaport's LTD
benefits were improperly terminated in January 2021, when Guardian informed Rappaport he
no longer qualified for benefits because he was capable of earning more than the maximum
permitted under the Plan.  Following the denial of his administrative appeal to Guardian,
Rappaport brought this suit seeking recovery of unpaid LTD benefits under section
502(a)(1)(B) of the Employment Retirement Income Security Act (ERISA) of 1974, 29
U.S.C. § 1132(a)(1)(B); reformation of the plan so that "insured earnings" would include his
K-1 earnings under section 502(a)(3), *id.* § 1132(a)(3); and attorneys' fees and costs under
section 502(g)(1), *id.* § 1132(g)(1).  Dkt. 1 ("Compl.") ¶¶ 114-141; *see also* Dkt. 31 ("AC").
Guardian asserted counterclaims for recovery of overpayment and set off.  Dkt. 99.  Following
summary judgment, Rappaport's claims and Guardian's counterclaim for set off remained.
*See Rappaport v. Guardian Life Ins. Co. of Am.*, No. 22-cv-08100 (JLR), 2024 WL 4872736,
at *17 (S.D.N.Y. Nov. 22, 2024) (*Rappaport I*).

The Court held a first bench trial on a stipulated record on April 1, 2025, and found that the Plan's insured-earnings definition included Rappaport's K-1 earnings and that, in the alternative, Rappaport was entitled to reformation of the plan to include K-1 earnings in the insured-earnings definition. *See generally Rappaport v. Guardian Life Ins. Co. of Am.*, 782 F. Supp. 3d 109 (S.D.N.Y. 2025) (*Rappaport II*). The parties asked the Court to remand to Guardian so that it could determine Rappaport's LTD benefits in accordance with the Court's finding and determine if any set off was appropriate. *Id.* at 130.

Following the remand, the parties informed the Court that they could not reach an agreement as to whether there had been an overpayment (or underpayment) of LTD benefits. Dkts. 161, 162. Guardian claimed that it was entitled to a set off in the amount of $100,297.72 in benefits as of January 22, 2021, while Rappaport argued that set off was inappropriate and instead claimed that he was owed $17,000 in unpaid benefits up until January 22, 2021. Dkt. 170 ("Pl. Br.") at 2; Dkt. 161 at 1. The parties identified three outstanding areas of disagreement: (1) how Guardian should have calculated Rappaport's insured earnings as of his date of disability in 2015; (2) whether Guardian properly indexed Rappaport's insured earnings each year; and (3) whether Guardian made errors calculating benefits in specific months. Dkt. 162 at 1. The Court permitted briefing and additional submissions with respect to these issues and held a second bench trial on September 3, 2025. Dkt. 165. No witnesses were presented, and the parties again asked the Court to decide the matter on a stipulated administrative record and oral argument. Tr. at 42:18-25.

In the meantime, Rappaport moved for attorneys' fees and costs based on the first bench trial, Dkt. 150, and to strike a report submitted by Guardian in connection with the second bench trial, Dkt. 176. Those motions are fully briefed.

For the following reasons, the Court concludes that Guardian's calculations on remand were largely correct, and that there was an overpayment of $97,297.72 prior to January 22, 2021, the date on which Guardian terminated Rappaport's LTD benefits. Therefore, the Court finds that Guardian is entitled to a set off in the amount of $97,297.72 against any future LTD benefits paid to Rappaport. In addition, the Court DENIES Rappaport's motion to strike and GRANTS in PART his motion for attorneys' fees and costs.

## BENEFITS CALCULATIONS PRIOR TO JANUARY 22, 2021

### I.    BACKGROUND[1]

Rappaport receives LTD coverage from a Guardian insurance policy obtained through his previous employer, Industrial Credit of Canada d/b/a/ ICC Mortgage Services ("ICC"). Stip. ¶¶ 1, 5-7, 10-11. When ICC applied for the LTD policy in 2005, it reported the earnings of its employees through a census report. App'x 5590, 5598. ICC's 2005 submission for Rappaport included both his W-2 wages and K-1 income from the previous calendar year. *See Rappaport II*, 782 F. Supp. 3d at 123 & n.4; App'x 5598.

On July 14, 2015, Rappaport began working part time due to severe symptoms from polycythemia vera, a debilitating form of leukemia. *Rappaport II*, 782 F. Supp. 3d at 115; *see also* Stip. ¶ 27; App'x 298. On August 17, 2015, Rappaport informed Guardian that he was unable to work full time and had reduced his work hours. Stip. ¶ 27. Rappaport applied for LTD benefits on September 15, 2015. Stip. ¶ 28. On September 21, 2016, Guardian informed Rappaport that it had determined that LTD benefits were payable and calculated his insured earnings, as defined by the Plan, as $18,333.33 per month. Stip. ¶¶ 29-30; *see* App'x 1066.

---

[1] Where necessary, the Court cites to the administrative record and joint stipulation of facts submitted in connection with the April 2025 bench trial. Citations to "App'x" refer to the administrative record, Dkts. 118 to 123; "Stip." to the parties' stipulated facts, Dkt. 112-1; and "Tr." to the bench trial transcript from September 3, 2025.

Guardian began paying Rappaport the maximum LTD benefit of $10,000 per month, effective

October 13, 2015, and paid that maximum monthly benefit through August 2020.  Stip. ¶¶ 31-

32; *see* App'x 1066.

On August 11, 2020, Guardian informed Rappaport that it was terminating his LTD

benefits because it had not received ongoing proof of claim, namely, forms from his medical

provider.  Stip. ¶ 61; App'x 2662-66.  After Rappaport submitted medical forms and his 2020

earnings, Stip. ¶¶ 64-69, Guardian informed Rappaport on January 22, 2021, that it had

determined he no longer qualified for disability payments because, as of January 1, 2019, he

was "capable of earning more than the maximum allowed while disabled," that is, "greater

than 80% of [his] indexed insured earnings."  Stip. ¶ 72; App'x 2854-55.  Guardian also stated

that it determined that it had overpaid Rappaport by $326,889.05 based on its recalculation of

his earnings while disabled and requested reimbursement of that amount.  App'x 2855.

The parties then proceeded through the administrative appeals process, and Rappaport

ultimately filed this ERISA action against Guardian on September 22, 2022.  *See generally*

Compl.  He sought recovery of unpaid LTD benefits under section 502(a)(1)(B) of ERISA, 29

U.S.C. § 1132(a)(1)(B); reformation of the Plan under section 502(a)(3) so that "insured

earnings" would include bonuses and commissions, *id.* § 1132(a)(3); and attorneys' fees and

costs under section 502(g)(1), *id.* § 1132(g)(1).  Compl. ¶¶ 114-141.  Following a remand for

Guardian to engage in further review of underwriting documentation, and after discovery, the

parties cross-moved for partial summary judgment on January 5, 2024.  Dkts. 74, 75, 76, 81.

The Court denied Guardian's motion for partial summary judgment, and granted Rappaport's

cross-motion for partial summary judgment in part and denied it in part.  *See generally*

*Rappaport I*, 2024 WL 4872736.  As relevant here, the Court held that a *de novo* standard

applied and that Rappaport's reformation claim in Count II was not time barred.  *See id.*

at *5-6, *13-14.  It also held that summary judgment on Rappaport's reformation claim was not appropriate because there were genuine disputes of material fact.  *See id.* at *7-9.  Finally, the Court entered summary judgment in favor of Rappaport as to Guardian's first counterclaim for restitution but denied Rappaport's motion for summary judgment as to Guardian's second counterclaim for set off.  *Id.* at *15-17.

On January 3, 2025, the parties informed the Court that they consented to a bench trial on the stipulated record.  Dkt. 112 at 2-3; *see also* Dkt. 113.  On April 1, 2025, the Court heard several hours of closing statements and oral argument from the parties.  Dkt. 139-1.  At the conclusion of the trial, the Court found that K-1 earnings should be included in Rappaport's insured earnings and remanded to Guardian, as requested, so that Guardian could determine the benefits due and/or whether there were any overpayments for purposes of any potential set off.  *Rappaport II*, 789 F. Supp. 3d at 130.

On June 25, 2025, the parties filed separate status reports informing the Court that they had not reached agreement on the amount of over- or underpayment of benefits.  Dkts. 161, 162, 163.  The Court held a conference on July 19, 2025, to address next steps to resolve the dispute.  Dkt. 165.  The parties represented that they consented to the Court resolving the dispute on the papers and evidence/record presented.  *Id.*  The parties filed their opening briefs on August 5, 2025, and their response briefs on August 19, 2025.  *See generally* Dkt. 168 ("Df. Br."); Dkt. 169 ("Guri Decl."); Dkt. 169, Ex. A ("First CPA Report"); Pl. Br.; Dkt. 173 ("Df. Resp."); Dkt. 174 ("Second Guri Decl."); Dkt. 174-1 ("Second CPA Report"); Dkt. 175 ("Pl. Resp.").  On August 20, 2025, Rappaport moved to strike the Second CPA Report, which Guardian submitted in connection with its response brief.  Dkt. 176.  Guardian opposed this motion on August 25, 2025.  Dkt. 178.

On May 30, 2025, Rappaport filed his motion for attorneys' fees in connection with the first bench trial, Dkt. 150, which is also fully briefed.  *See* Dkts. 151, 159, 166.

The Court held a second bench trial on September 3, 2025, to address the appropriate calculation of benefits prior to termination on January 22, 2021.  Dkt. 165; *see generally* Tr. The Court's findings of fact and conclusions of law follow.

## II.    DISCUSSION

The Court's findings of fact and conclusions of law are contained in this section because some findings are more clearly described in the legal context in which they must be evaluated.  The Court's factual findings from its first bench trial in *Rappaport II*, 782 F. Supp. 3d 109, some of which are detailed above, are incorporated by reference as well.

The parties' benefit-payment dispute derives from three main areas of continued disagreement: (1) how "insured earnings" should have been calculated in 2015, when Rappaport applied for benefits; (2) whether Guardian properly indexed Rappaport's earnings each year; and (3) whether Guardian erred in calculating benefits in specific months.  The parties agree that *de novo* review continues to apply.  Tr. at 6:12-15, 30:5-7.  The Court addresses each issue in turn.

### A.    Calculation of Insured Earnings

On remand, Guardian recalculated Rappaport's insured earnings as of March 1, 2015, based on his 2014 tax returns.  Df. Br. at 8; *see also* First CPA Report at 2.  Rappaport contends that this was in error and that the Plan required Guardian to use the 12 months of earnings prior to March 1, 2015, that is, his earnings from March 1, 2014 to February 28, 2015.  Pl. Br. at 1.

### 1. Legal Principles

In reviewing an issue of plan interpretation *de novo*, "the court will construe the terms of an ERISA plan according to federal common law." *Mullally v. First Reliance Standard Life Ins. Co.*, 253 F. Supp. 2d 279, 282 (D. Conn. 2003) (citing *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002)). The Court "may look to state law," though it "may use state common law as the basis of the federal common law only if the state law is consistent with the policies underlying [ERISA]." *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004) (quoting *Krishna v. Colgate Palmolive Co.*, 7 F.3d 11, 14 (2d Cir. 1993)). The Court "'interpret[s] ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience.' If there are ambiguities in the language of an insurance policy that is part of an ERISA plan, they are to be construed against the insurer" on *de novo* review. *Critchlow*, 378 F.3d at 256 (citations omitted) (quoting *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1452 n.1 (5th Cir. 1995)) (collecting cases); *see also Tyll v. Stanley Black & Decker Life Ins. Program*, 403 F. Supp. 3d 27, 32 (D. Conn. 2019) (similar). "Language in a plan 'is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire . . . agreement.'" *Critchlow*, 378 F.3d at 256 (omission in original) (quoting *Fay*, 287 F.3d at 104). Where language is "unambiguous," the Court "interpret[s] and enforce[s] [it] according to its 'plain meaning.'" *Aramony v. United Way of Am.*, 254 F.3d 403, 412 (2d Cir. 2001) (quoting *Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 149 (2d Cir. 1999)).

### 2. Analysis

Guardian calculated Rappaport's insured earnings as of March 1, 2015 as $47,013.17, based on his 2014 tax return that included his W-2 and K-1 earnings from 2014. Df. Br. at 9; *see also* First CPA Report at 2. Rappaport argues that this was in error because the Plan

required Guardian to use his "current" earnings as of March 1, 2015, which "necessarily includes two months from 2015." Pl. Br. at 1. Under Rappaport's calculations, his insured earnings as of March 1, 2015, were $58,063.67. *See id.* at 1, 10.

The Court begins with the Plan's language. Guardian determines benefits paid under the Plan using the insured's "*insured earnings* in effect on the date [the insured's] *disability* starts." App'x 76. Specifically, Guardian "calculate[s] benefit amounts and limits based on the amount of [the insured's] *insured earnings* on the record with [Guardian] as of the Redetermination date immediately prior to the start of [the insured's] *disability*." *Id.* at 86. The redetermination date for this Plan was March 1, and the parties agree that the relevant redetermination date based on the disability claim here was March 1, 2015. *Id.* at 77; Pl. Br. at 1, Df. Br. at 14. The policy states that "[e]ach March 1st, the *plan sponsor* must report current *insured earnings* for all covered persons under the *plan*," App'x 77; however, Rappaport does not dispute that ICC, the plan sponsor, did not "report current *insured earnings*" as of March 1, 2015, as required by the Plan, Tr. at 9:6-13. The policy cautions that "[t]he amount of [the insured's] *gross monthly benefit* may be limited if the *plan sponsor* has not updated the amount of [the insured's] *insured earnings* to reflect [the insured's] then current *insured earnings* on the most recent reporting date prior to the start of [the insured's] *disability*." App'x 76.

For many reasons, the Court agrees with Guardian that Rappaport's insured earnings for purposes of his disability benefits determination should be calculated based on Rappaport's 2014 tax returns rather than using a mix of 2014 and 2015 tax information. The policy states that Guardian shall calculate benefits using the "amount of . . . *insured earnings* on the record with [Guardian]" as of March 1, 2015. App'x 86; *see id.* at 77. At the time that Guardian calculated Rappaport's insured earnings for purposes of evaluating his disability-

benefit claim in September 2015, Rappaport's 2015 tax information was neither available nor provided to Guardian. *See, e.g.*, App'x 1074-121, 1129 (submitting 2015 tax returns in August and September 2016).

In his response brief, Rappaport argues that his 2014 tax returns were not "on the record" with Guardian as of March 1, 2015, since they were filed on March 20, 2015. Pl. Resp. at 4. However, Guardian's calculation of Rappaport's benefits would not have taken place until after Rappaport made a claim for benefits in September 2015, and at that point, Rappaport's 2014 tax returns had been filed and could be used to calculate his insured earnings for purposes of a March 1, 2015 redetermination date. Tr. at 35:11-36:19. Rappaport admits that he never submitted *monthly* K-1 earning information in 2015 (or any 2015 K-1 information in 2015), so evidence of his January and February 2015 K-1 earnings could not have been available to Guardian for purposes of a March 1, 2015 redetermination-date calculation when the claim was made in September 2015. Given that the Plan placed the onus of reporting changes to insured earnings on the plan sponsor, ICC, App'x 76, and ICC never did so, Rappaport cannot now argue that the first two months of his 2015 K-1 earning should have been included in the redetermination calculation.

Moreover, it is undisputed that Rappaport's K-1 earnings were variable and were not earned on a regular monthly schedule. As Rappaport acknowledged in his Amended Complaint, he earned K-1 partnership income in varying amounts during different months throughout the year. AC ¶¶ 31-32. For example, in 2014, he earned $40,000 in January 2014, $25,000 in March 2014, $160,000 in November 2014, and $50,000 in December 2014. *Id.* ¶ 32. Rappaport has not provided *any* evidence of the amounts of K-1 income that he received in January and February of 2015 (nor did he provide it to Guardian at the time of his disability claim) and instead asks Guardian (and the Court) to extrapolate income earned in those

months by calculating a monthly average for his 2015 K-1 income — a calculation that does not comport with the historic distribution of his K-1 income. There is therefore no basis under the policy language or otherwise to include amounts in insured earnings that were not available at the time Guardian did its redetermination calculation in late 2015 and that are not based on any reliable evidence of Rappaport's actual income in January and February 2015.

Moreover, prior to this remand, Rappaport himself calculated his earnings as of March 1, 2015, in a manner that did *not* include the first two months of 2015. He stated that "[o]n March 1, 2015, Mr. Rappaport was earning $564,137 per year, consisting of $220,000 per year in W-2 income and $344,137 per year in nonpassive K-1 income." AC ¶ 27; *see id.* ¶¶ 28-29 (noting that Rappaport had reported that income on his 2014 federal tax return). The W-2 and K-1 income referenced are for the 2014 calendar year, *id.* ¶¶ 27-29, and Rappaport's allegation regarding his income as of March 1, 2015, is nearly identical to the amount that Guardian recalculated on remand, *see id.* ¶ 27; First CPA Report at 2.

Finally, using the prior year's tax information in calculating the insured earnings also comports with the evidence in the record regarding Guardian's practices. Guardian has provided sworn testimony that "[i]n policies that expressly include non-passive business income in the calculation of Insured Earnings, Guardian's practice is to look to tax return data for the prior calendar year." Second Guri Decl. ¶ 15.

Therefore, the policy language and other evidence support the Court's conclusion that Guardian correctly calculated Rappaport's "insured earnings" as of March 1, 2015, based on his tax returns reflecting his 2014 earnings, because Rappaport's 2015 K-1 income tax returns

were not filed in 2015, not presented to Guardian in 2015, and even now do not reflect the amounts Rappaport earned in January and February 2015.[2]

Thus, the Court finds that Guardian properly recalculated Rappaport's insured earnings as of March 1, 2015, as $47,013.17 per month. *See* First CPA Report at 2.

## B. Indexing

The parties next dispute whether Guardian properly indexed Rappaport's insured earnings as required by the Plan. Pl. Br. at 14-17; Df. Resp. at 7-9. Before addressing this issue, however, the Court must first address Rappaport's motion to strike the Second CPA Report, which Guardian submitted to explain how it indexed insured earnings. Dkt. 176; *see generally* Second CPA Report.

Rappaport argues that the Court should not consider the Second CPA Report because Guardian should have produced it pursuant to ERISA's claim-procedure regulations, and because it improperly introduces new arguments on reply. Dkt. 176 at 1. Neither argument is persuasive. As to the first, there is no indication in the record that Rappaport requested any of the documents relied upon in connection with the instant benefits determination on remand and, in fact, Rappaport successfully opposed reopening discovery during the latest remand process. *See* Dkts. 144, 146, 149; 29 C.F.R. § 2560.503-1(h)(2)(iii) ("[A] claimant shall be

---

[2] The parties' competing interpretations of *Ling Chen v. Commissioner of Social Security*, No. 15-cv-01724 (PKC), 2017 WL 1232470 (E.D.N.Y. Mar. 31, 2017), *aff'd*, 741 F. App'x 849 (2d Cir. 2018) (summary order), are unhelpful. While Guardian cites this case in support of the proposition that "average current earnings" refers to earnings in a single calendar year, Df. Br. at 15, the regulation at issue in *Ling Chen* expressly stipulated that the relevant time period was a "calendar year," 20 C.F.R. § 404.408(c)(3)(i)(C), unlike the Plan's insured-earnings definition here. Rappaport's contention that *Ling Chen* suggests that the Court should use the "highest single year during the five years preceding disability," Pl. Resp. at 5, also rings hollow since the social-security regulations at issue in *Ling Chen* explicitly required it, *see* 2017 WL 1232470, at *3; 20 C.F.R. § 404.408(c)(3)(i)(C), and the Plan here nowhere suggests that this would be an appropriate way to calculate insured earnings.

provided, *upon request* and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." (emphasis added)).  Moreover, while courts in this Circuit sometimes decline to consider evidence or arguments submitted in reply, *see, e.g.*, *Royal Park Inv. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 395 (S.D.N.Y. 2018), here, Guardian submitted the Second CPA Report in response to Rappaport's opening brief, essentially in an opposition posture.  Rappaport had a full opportunity to respond to this evidence and the arguments presented therein at the bench trial the Court held on September 3, 2025, Tr. at 16:21-17:5, and therefore he is not unduly prejudiced by the Court's consideration of the Second CPA Report.  *Cf. Duracell U.S. Operations, Inc. v. Energizer Brands, LLC*, No. 25-cv-05020 (JPC), 2025 WL 2388287, at *2 (S.D.N.Y. Aug. 18, 2025) ("Where . . . the nonmoving party has had an adequate opportunity to respond to the new arguments or evidence presented by the moving party's reply brief, courts may, in their discretion, consider such arguments or evidence." (collecting cases)).  Thus, the Court denies Rappaport's motion to strike the Second CPA Report.

The Court now turns to the merits of the indexing dispute.  Under the "Indexing" section of the Plan, if a covered person "return[s] to work while *disabled*," Guardian "adjust[s] [their] *insured earnings* each year . . . by means of an indexing factor."  App'x 80.  "The indexing factor is the lesser of: (a) 10%; or (b) one-half of the percentage change in the *CPI-W* for the prior calendar year."  *Id.*  Rappaport argues that for the latter part of this definition, the percentage change in CPI-W data should be calculated by comparing the CPI-W from January of one year to January of the prior year, while Guardian argues that it should be calculated by comparing the percentage change in the *average* CPI-W from one year (December 1 to January 31) to the next year.  *See* Pl. Br. at 14-17; Df. Resp. at 7-9; Pl. Resp. at 6-7.  The Court agrees with Guardian.

The Plan language here is unambiguous.  Despite Rappaport's arguments that "calendar year" naturally refers to a January-to-January comparison, a reasonable person reading the Plan's terms would understand that "calendar year" refers to the period of time between January 1 and December 31 of any given year.  *See Calendar Year*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/calendar%20year [https://perma.cc/7ZV5-6MC9] (defining "calendar year" as "a period of a year beginning and ending with the dates that are conventionally accepted as marking the beginning and end of a numbered year"); *Draper v. Wellmark, Inc.*, 478 F. Supp. 2d 1101, 1108 (N.D. Iowa 2007) (finding that that the term "calendar year" in insurance policy unambiguously referred to "the period from January 1 to December 31, inclusive," and collecting cases holding the same); *McKennee v. Cont'l Cas. Co.*, No. 03-cv-03176, 2005 WL 289972, at *5 (N.D. Cal. Feb. 4, 2005) ("This Court finds that a lay person is more likely to define 'calendar year' as January through December of the same year rather than any other 12 month period.").  Thus, to calculate the indexing factor, Guardian should compare the average annual CPI-W between calendar years to calculate the percentage change.  The Court has reviewed the Second CPA Report and finds that Guardian properly calculated the indexing factor based on the percentage change for the annual CPI-W.  *See* Second CPA Report at 16.[3]

---

[3] Rappaport complained at oral argument that Guardian had not shown precisely how it calculated the indexing factor.  Tr. at 28:23-29:7.  The Court was able to use the simple percentage-change formula Rappaport identified, Pl. Resp. at 6, substituting "January" CPI-W with "annual" CPI-W, to confirm Guardian's numbers with little difficulty using the following formula:

$$Indexing\ Factor_{year\ n} = \frac{1}{2} * (100 * \frac{average\ CPI_{year\ n} - average\ CPI_{year\ n-1}}{average\ CPI_{year\ n-1}})$$

Rappaport's January-to-January indexing proposal has no basis in the text of the Plan, which requires reference to the CPI-W for the "prior calendar *year*," App'x 80, not the change in the January CPI-W from year to year. Indeed, selecting a random month — here, January — and calculating the annual change for that month could produce an inaccurate measure if there was an outlier CPI-W in any given January. Using the average of the CPI-W for a "calendar year" as the policy language requires would reduce the chance of such outlier fluctuations.

In sum, Court rejects Rappaport's proposed methodology for calculating indexed insured earnings as inconsistent with the language of the plan, and concludes that the Guardian correctly indexed insured earnings each year by using the change in average CPI-W data for the prior calendar year to calculate the indexing factor.

## C.  Specific Calculations

Rappaport finally objects to Guardian's benefits calculations for three time periods: (1) October to December 2015; (2) all of 2020; and (3) January 1 to 12, 2021. Pl. Br. at 17. The Court addresses each in turn.

### 1.  *October, November, and December 2015*

On remand, Guardian determined that it overpaid Rappaport by $10,000 (the maximum disability benefit) in October, November, and December 2015. First CPA Report at 12. Specifically, Guardian found that Rappaport's disability earnings exceeded his insured earnings by $26,519.75 each of those months and thus he should not have been paid any benefits for those months, *id.*, because "[t]he monthly income [he] earned from working while *disabled*" exceeded more than 80 percent of insured earnings, App'x 86; *see id.* at 80. *See* Df. Resp. at 9. Rappaport argues that Guardian erred in doing so because (1) in calculating his income earned during disability, it assumed that K-1 earnings were equally distributed

throughout 2015, and (2) Guardian's assumption is inconsistent with its previous determination that he was disabled in this period. Pl. Br. at 17-18. The Court disagrees.

First, Rappaport's argument that Guardian erred by averaging his 2015 earnings throughout the year to calculate his "income earned during disability" under the Plan is unpersuasive. Guardian recalculated Rappaport's monthly income earned during disability by dividing Rappaport's annual earnings (including W-2 wages and K-1 income) by twelve. *See* Df. Br. at 9; First CPA Report at 2 (calculating annual earnings); Second CPA Report at 13-15 (reporting calculations of disability earnings). Rappaport argues that his 2015 K-1 earnings at ICC were all "attributable to work performed before July 14, 2015," when he stopped working full time. Pl. Br. at 17. But the K-1 earnings here were based on the profits the partnership made and were not directly linked to the amount that an individual partner worked. *See* *Rappaport II*, 782 F. Supp. 3d at 113 (explaining that Rappaport's K-1 earnings "consisted of Rappaport's portion of the partnership profits that were paid to him periodically throughout the year"). Thus, the fact that Rappaport may have worked less in the second half of 2015 has little to do with whether he received K-1 income during that time and provides no basis to conclude that Guardian should have attributed his K-1 income to time periods in 2015 when he was allegedly working more. Moreover, the 2015 K-1 earnings were only reported to Guardian in an annual tax return that did not designate when the monies were distributed to Rappaport during the year. *See* App'x 1074; Dkt. 163-6. Thus, Rappaport never submitted any evidence, either to Guardian or to this Court, supporting the claim that Rappaport's 2015 K-1 earnings were distributed in the first half of the year. As a result, because Rappaport did not provide Guardian with any information about when his 2015 K-1 income was actually distributed to him, Guardian did not err in treating Rappaport's 2015 K-1 income as evenly

distributed over the course of 2015 for purposes of calculating his income earned during disability.

The Court is further unpersuaded by Rappaport's argument that because Guardian treated Rappaport as disabled as of July 2015, he was, "by definition, unable to earn more than 80% of his Insured Earnings as of that date," and therefore Guardian's calculation of Rappaport's 2015 earnings "conflicts with Guardian's prior approval of his claim from 2015 to 2020." Pl. Br. at 18. Not only is Rappaport's 2015 K-1 partnership income not based on how much Rappaport individually worked during certain months of 2015, but Guardian's earlier disability benefit determinations did not consider Rappaport's K-1 income at all — prompting this very litigation. On remand, Guardian now includes his K-1 income in his benefits calculations, as directed by the Court (and requested by Rappaport), and including this income leads to a correct determination that there were overpayments of LTD benefits of $10,000 per month in October, November, and December 2015.

### 2. 2020 Earnings

Rappaport next argues that Guardian erred in calculating his 2020 benefits because it averaged his annual earnings, rather than examining his earnings for each month of 2020. Pl. Br. at 18-19. The Court is not convinced.

Rappaport contends that the Plan "expressly requires a month-by-month analysis when determining whether part-time earnings during disability reduce benefits," Pl. Br. at 18, and directs the Court to the Plan's "Determining Your Monthly Benefit" section, *id.* at 18-19. The Plan provides as follows:

Your *monthly benefit* is determined as shown below.

(a) Multiply your *insured earnings* by 60%. Round this amount to the nearest dollar.

16

(b) If the amount determined above is less than this *plan's maximum monthly benefit*, that amount is your *gross monthly benefit*.

If the amount determined above is equal to or more than this *plan's maximum monthly benefit*, your *gross monthly benefit* is equal to the *maximum monthly benefit*.

App'x 76. But the "Determining Your Monthly Benefit" provision does not address reductions in disability benefits based on the amounts earned while disabled. Rather, another section, "If You Work While Disabled," explains that an insured's monthly benefit may be reduced if "income earned during disability" exceeds a certain level. App'x 79. As explained above, the Plan did not require Guardian to review part-time earnings each month to calculate "income earned during disability," since Guardian lacked the full information to do so. While Rappaport contends that Guardian could have determined his part-time earnings for each month of 2020, since he submitted paystubs from his biweekly salary and the commissions he earned throughout the year, Pl. Br. at 19, Guardian would not have been able to recalculate Rappaport's monthly earnings because of the need to take into account Rappaport's K-1 earnings. In 2020, Rappaport claimed a net annual loss of $46,555 in his K-1 from his business, Fahrenheit 24 LLC, but did not submit information about when those losses were incurred. *See* App'x 6047. As a result, Guardian could not have accurately calculated Rappaport's income earned while disabled for each month in 2020, as Rappaport suggests it ought to have, because it did not have complete monthly K-1 information.

As such, Guardian correctly calculated Rappaport's income earned during disability in 2020 as $12,797 per month, and therefore found there was a net overpayment of $26,782 in 2020 (consisting of seven months of overpayments of $6,398.50, minus five months of underpayments of $3,601.50).

### 3. January 1 to 21, 2021

Finally, Rappaport argues that Guardian erred when it calculated his benefits from January 1 to 21, 2021, since it used his 2020 earnings, not his 2021 earnings, and did not calculate benefits owed from January 13 to January 21, 2021. Pl. Br. at 20-21. Rappaport argues that this resulted in an underpayment, and that he is entitled to $7,000 in benefits for January 2021. Pl. Resp. at 10.

Guardian properly used 2020 earnings to calculate Rappaport's benefits from January 1 to 12, 2021. The Court's review of the CPA Reports and the record reveals that instead of making payments on the 1st of each month, Guardian's monthly pay periods began on the 13th of each month for the entire time Guardian paid benefits for this claim and ran through the 12th of the following month. *See* First CPA Report at 12-14. As a result, each January, Guardian would use the previous year's earnings information for the first twelve days of the new year. In 2016, for example, for the first full calendar year that Guardian paid benefits, Guardian used Rappaport's 2015 disability earnings information for the pay period that ran from December 13, 2015, to January 12, 2016, and began using 2016 disability earnings for the pay period that began on January 13, 2016. *Id.* at 12. This did not produce over- or underpayments, however, since Guardian then used 2016 disability earnings through January 12, 2017, and continued this process each year. *Id.* at 13-14. Thus, in 2020, Guardian began using 2020 disability earnings on January 13, 2020, and recalculated benefits using 2020 disability earnings through January 12, 2021. *Id.* at 14. This process was consistent with the payment structure Guardian used throughout the life of Rappaport's disability claim, and to which Rappaport does not otherwise object.

On the other hand, Guardian did fail to calculate whether there was an over- or underpayment for January 13 to January 21, 2021. The Court ordered Guardian to determine

the amount of over- or underpayment "prior to January 22, 2021," Dkt. 149, since Guardian terminated Rappaport's LTD benefits on January 21, 2021, but Guardian stopped its calculations on January 12, 2021, *see generally* First CPA Report; Second CPA Report.

Guardian acknowledged that it failed to do this calculation and suggested that it could do so on subsequent remand. Tr. at 41:22-42:11. However, a third remand here is not necessary because using the CPA Reports and the Plan, the Court has been able to calculate the amount of underpayment for those few days. The Plan provides that if the insured's income earned during disability was less than 20 percent of their indexed insured earnings, Guardian would not reduce the insured's monthly benefit for that month. App'x 79. The First CPA Report reflects that in 2021, Rappaport earned $66,085. First CPA Report at 2. This would have produced monthly disability earnings of $5,507.08. Rappaport's indexed insured earnings in January 2021 were $48,755.65. Second CPA Report at 15. Thus, beginning January 13, 2021, Rappaport's income earned during disability was less than 20 percent of his indexed insured earnings, and he would have been entitled to the full $10,000 benefit that month. The Court has prorated the underpayment based on the nine days of the January 13, 2021 to February 12, 2021 pay period before Guardian terminated benefits on January 22, 2021, and finds that there was an underpayment of $3,000 between January 13, 2021 and January 21, 2021. Thus, the Court will reduce the amount of overpayment calculated by Guardian by $3,000 to $97,297,72.

### D. Set Off Determination

Rappaport does not contest that Guardian would be entitled to a set off if there was an overpayment. In light of the fact that set off was traditionally available as a remedy in equity, and that other courts have concluded that set off remains available "to recover debts owed by the participant to the plan as a result of a prior overpayment of benefits," *Coar v. Kazimir*, 990

F.2d 1413, 1421-22 (3d Cir. 1993) (citing 26 C.F.R. §§ 1.401(a)-13(c)(2)(iii), (d)(2)), the

Court concludes that Guardian's set off claim is legally cognizable under ERISA.  Based on

the foregoing, the Court finds that Guardian is entitled to a set off in the amount of $97,297.72

as of January 22, 2021, against any future claim for benefits provided to Rappaport.[4]

## MOTION FOR ATTORNEYS' FEES

The Court next considers Rappaport's earlier motion for attorneys' fees because he

contends that he was a prevailing party in connection with the Court's findings at the April

2025 bench trial.  *See Rappaport II*, 782 F. Supp. 3d 109.  Rappaport moves the Court for an

order awarding $461,402.78 in attorneys' fees, $3,144.00 in costs, and an order instructing

Guardian to include simple interest at a rate of 9 percent, effective August 12, 2020, in the

calculation of back benefits paid as a result of the Court-ordered remand.  Dkt. 150; Dkt. 151

("Fees Br.") at 1; *see also* Dkt. 152 ("Hess Aff."); Dkt. 153 ("Riemer Aff."); Dkt. 166 ("Fees

Reply"); Dkt. 167 ("McIntyre Aff.").  Guardian opposes this motion.  Dkt. 159 ("Fees Opp.");

Dkt. 160 ("Magratten Decl.").  Specifically, Guardian opposes the motion for fees on the

grounds that (1) Rappaport has not showed "some degree of success on the merits," as

required to award fees under ERISA, (2) the fee award sought is unreasonable, and (3) the

---

[4] Guardian also seeks pre- and postjudgment interest on the amount of any set off under 28
U.S.C. § 1961.  *See* Dkt. 161-4 (proposed judgment); Df. Br. at 1 n.1.  However, 28 U.S.C.
§ 1961 only permits interest on "any money judgment in a civil case," 28 U.S.C. § 1961(a),
and Guardian has not cited any case suggesting that the administrator of a plan is entitled to
interest on equitable set offs against future benefits.  *See Money Judgment*, *Black's Law
Dictionary* (12th ed. 2024) ("A judgment for damages subject to immediate execution, as
distinguished from equitable or injunctive relief."); *Trs. of the I.B.E.W. Loc. Union No. 488
Pension Fund v. Norland Elec., Inc.*, No. 11-cv-00709, 2015 WL 3581011, at *9 (D. Conn.
June 5, 2015) ("Post-judgment interest is applicable in the ERISA context in the same manner
in which it is awarded in other civil actions in which *money damages* are awarded." (emphasis
added)); *cf. Wells v. U.S. Steel*, 76 F.3d 731, 737-38 (6th Cir. 1996) (reasoning that award of
prejudgment interest to pension fund was not authorized by ERISA where fund sought
"restitution of money it overpaid plan beneficiaries").  The Court will therefore not grant pre-
or postjudgment interest to Guardian.

costs sought are unreasonable. Fees Opp. at 5-6. The Court begins with Guardian's first argument.

## I.    Entitlement to Attorneys' Fees and Costs

Rappaport argues that he is entitled to attorneys' fees and costs because he achieved sufficient success on the merits in this litigation. Fees Br. at 5-8. Guardian argues that the Court should not award fees and costs because Rappaport has only achieved a "procedural victory" and has not obtained a judgment in his favor. Fees Opp. at 7. It also argues that the Court should consider the factors set forth in *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869 (2d Cir. 1987), if it finds that Rappaport has achieved success on the merits, and that those factors weigh against an award. Fees Opp. at 7-9.

The Court in an ERISA action may, "in its discretion[,] . . . allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). "Congress intended the fee provisions of ERISA to encourage beneficiaries to enforce their statutory rights." *Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 47 (2d Cir. 2009). However, the "district court's discretion to award attorneys' fees under ERISA 'is not unlimited,' inasmuch as it may only award attorneys' fees to a beneficiary who has obtained 'some degree of success on the merits.'" *Donachie v. Liberty Life Assurance Co. of Bos.*, 745 F.3d 41, 46 (2d Cir. 2014) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 254-55 (2010)). Thus, a court considering whether to award fees "*may*, without further inquiry, award attorneys' fees to a plaintiff who has had 'some degree of success on the merits,'" but "retain[s] discretion" to consider the *Chambless* factors, namely:

> (1) the degree of opposing parties' culpability or bad faith; (2) ability of opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve

a significant legal question regarding ERISA itself; and (5) the relative merits of
the parties' positions.

*Donachie*, 745 F.3d at 46 (quoting *Hardt*, 560 U.S. at 249 n.1); *see also Chambless*, 815 F.2d

at 871 (identifying same five factors).

Rappaport satisfies the requirement that he achieve some degree of success on the

merits. While "trivial success on the merits or a purely procedural victory" does not satisfy

this requirement, a party may satisfy the requirement "if the court can fairly call the outcome

of the litigation some success on the merits without conducting a lengthy inquiry into the

question whether a particular party's success was substantial or occurred on a central issue."

*Hardt*, 560 U.S. at 255 (alteration adopted) (internal quotation marks and citation omitted);

*accord Tedesco v. I.B.E.W. Loc. 1249 Ins. Fund*, No. 14-cv-03367 (CS), 2019 WL 140649,

at *4 (S.D.N.Y. Jan. 9, 2019). Courts in this Circuit have awarded fees to "plaintiffs in

ERISA actions based solely on achieving a remand for further consideration by the

administrative body," *Dimopoulou v. First Unum Life Ins. Co.*, No. 13-cv-07159 (ALC), 2017

WL 464430, at *1 (S.D.N.Y. Feb. 3, 2017) (collecting cases), as well as denial of cross-

motions for summary judgment, *see Thomas R. v. Hartford Life & Accident Ins. Co.*, No. 21-

cv-01388 (JGK), 2025 WL 754123, at *2-3 (S.D.N.Y. Mar. 10, 2025). Here, Rappaport

succeeded in his motion for summary judgment on the issue of whether *de novo* review should

be applied to the benefits denial and on Guardian's counterclaim for restitution. *See*

*Rappaport I*, 2024 WL 4872736, at *9-14, *16-17. He also defeated Guardian's motion for

summary judgment. *See id.* at *17. Further, at the first bench trial, Rappaport prevailed on

the only issue that the parties asked this Court to decide — the central issue of whether the

Plan's definition of insured earnings included Rappaport's K-1 earnings or whether it should

be reformed to include those earnings — and the Court remanded for Guardian to recalculate

benefits consistent with Rappaport's position.  *See Rappaport II*, 789 F. Supp. 3d at 130.  That remand plainly qualifies as "some success on the merits."  *Scarangella v. Grp. Health, Inc.*, 731 F.3d 146, 155 (2d Cir. 2013) ("[*Hardt*] clearly held that a remand order opining positively on the merits of the plaintiff's claim was sufficient [to award attorneys' fees]."); *see, e.g.*, *Montefiore Med. Ctr. v. Loc. 272 Welfare Fund*, No. 09-cv-03096 (RA) (SN), No. 14-cv-10229 (RA) (SN), 2019 WL 4565099, at *3 (S.D.N.Y. Sept. 19, 2019) (remand following summary judgment in plaintiff's favor qualified as "some success on the merits"); *Graziano v. First Unum Life Ins. Co.*, No. 21-cv-02708 (PAC), 2024 WL 1175143, at *2 (S.D.N.Y. Mar. 19, 2024) (remand for benefits determination following bench trial constituted success on the merits); *Rhodes v. First Reliance Standard Life Ins. Co.*, No. 22-cv-05264 (AKH), 2023 WL 9113226, at *1 (S.D.N.Y. Dec. 27, 2023) (awarding attorneys' fees following holding that defendant "violated ERISA's claim procedure regulations, resulting in a denial of [plaintiff's] right to a full and fair review of his claims").

Guardian next argues that the Court should apply the five *Chambless* factors, and that those factors weigh against an award of fees.  While the Court need not consider these factors to award fees in an ERISA case, *see Caccavo ex rel. Caccavo v. Reliance Standard Life Ins. Co.*, No. 19-cv-06025 (KMW), 2022 WL 16631101, at *5 (S.D.N.Y. Nov. 2, 2022), the Court will address them here in an abundance of caution.  No single *Chambless* factor is "dispositive," but the first factor, "the degree of opposing parties' culpability or bad faith," and the fifth factor, "the relative merits of the parties' positions," "weigh heavily."  *Donachie*, 745 F.3d at 46-47.  "When a plaintiff has 'prevailed' on the merits, 'granting a . . . request for fees is appropriate absent "some particular justification for not doing so.""'"  *Schuman v. Aetna Life Ins. Co.*, No. 15-cv-01006, 2017 WL 2662191, at *5 (D. Conn. June 20, 2017) (alteration adopted) (omission in original) (quoting *Donachie*, 745 F.3d at 46-47).

The first factor, the degree of the opposing party's bad faith or culpability, slightly favors Rappaport. "[T]he concepts of 'bad faith' and 'culpability' are distinct, and either one may satisfy the first *Chambless* factor." *Pierorazio v. Thalle Constr. Co.*, No. 13-cv-04500 (VB), 2014 WL 3887185, at *4 (S.D.N.Y. June 26, 2014) (alteration in original) (quoting *Donachie*, 745 F.3d at 47). "[C]ulpable conduct is commonly understood to mean conduct that is 'blameable, censurable; . . . at fault; involving the breach of a legal duty or the commission of a fault.'" *Slupinski*, 554 F.3d at 48 (quoting *Locher v. Unum Life Ins. Co. of Am.*, 389 F.3d 288, 299 (2d Cir. 2004)). Since Guardian did not follow the Department of Labor's regulations, resulting in *de novo* review, and administered the Plan in a way that the Court found was inconsistent with its language, it is somewhat "culpable" within the meaning of *Chambless*. *See MacLeod v. Procter & Gamble Disability Benefit Plan*, 460 F. Supp. 2d 340, 349 (D. Conn. 2006) (first *Chambless* factor favored plaintiff where defendants' "adoption of the categorical military exclusion violated ERISA by contravening the plain language of the [p]lan"). An award would therefore have a deterrent effect with regard to future regulatory noncompliance and thus the third factor also slightly favors Rappaport.

Guardian does not dispute the second factor, its ability to pay. *See generally* Fees Opp. However, the Second Circuit has held that a defendant's ability to pay does not weigh heavily in favor of an award, *Lauder v. First Unum Life Ins. Co.*, 284 F.3d 375, 383 (2d Cir. 2002), and thus this is generally neutral in effect, *see Benjamin v. Oxford Health Ins.*, 355 F. Supp. 3d 131, 140 (D. Conn. 2019) (although "a large insurance company has the ability to pay, this factor does not weigh heavily in the Court's analysis").

The fourth factor asks whether the action conferred a common benefit on a group of plan participants. Rappaport halfheartedly contends that his suit "conferred a common benefit to all insureds who apply for future benefits," for the same reasons articulated in his

discussion of the third *Chambless* factor, Fees Br. at 7, but this case was not designed to confer a common benefit, *see Schuman*, 2017 WL 2662191, at \*6 (fifth *Chambless* factor did not favor plaintiff where he could not "point[] to any common benefit beyond the deterrent effect that is taken into account in the third *Chambless* factor" (alteration in original) (citation omitted)).  Thus, this factor favors Guardian, but it does not preclude attorneys' fees.  *See Locher*, 389 F.3d at 299.

The fifth factor addresses the relative merits of the parties' positions.  This factor favors Rappaport, since he prevailed on the central issue in this case and the sole question that was presented to the Court in the first bench trial — whether the Plan's insured-earnings definition included K-1 earnings and thus whether Guardian properly terminated Rappaport's benefits in January 2021 because of his earnings while on disability.

In sum, Rappaport is eligible for attorneys' fees and costs through the first bench trial because he has achieved "some degree of success on the merits," and because, on balance, the *Chambless* factors favor an award.

## II. Reasonableness of Attorneys' Fees

Rappaport seeks a fee award of $461,402.78.  Fees Br. at 1.  Guardian argues that even if the Court permits an award of attorneys' fees, the amount Rappaport claims is unreasonable.  Fees Opp. at 10-15.  "Attorneys' fees are awarded by determining a presumptively reasonable fee, reached by multiplying a reasonable hourly rate by the number of reasonably expended hours."  *Bergerson v. N.Y. State Off. of Mental Health*, 652 F.3d 277, 289 (2d Cir. 2011); *accord Graziano*, 2024 WL 1175143, at \*2.  The Court begins with the hourly rates charged by Rappaport's counsel.

### A. Reasonable Hourly Rate

Rappaport retained the law firm of Riemer Hess LLC ("Riemer Hess") to represent him in this matter.  Fees Br. at 3.  Rappaport seeks the following hourly rates for his attorneys: $925 per hour for founding partner Scott M. Riemer, $750 per hour for partner Jennifer Hess, $600 per hour for senior associate Ryan McIntyre, $510 for associate Samantha Wladich, $385 per hour for senior paralegal Hannah Cohrane, $370 per hour for senior paralegal Michele Wagner, $365 per hour for former senior paralegal Ariana Gonzalez, $310 per hour for paralegal Jessica Carrion, and $300 per hour for paralegal Samantha Corneille-Renner. Fees Br. at 9-10.  Guardian contends that Rappaport's requested hourly rates are unreasonable because they "significantly exceed rates typically awarded" in this District for ERISA litigation.  Fees Opp. at 14.

The Second Circuit's "forum rule generally requires use of the hourly rates employed in the district in which the reviewing court sits in calculating the presumptively reasonable fee." *Bergeson*, 652 F.3d at 290 (internal quotation marks omitted).  "A court may determine the reasonable hourly rate by relying both on 'its own knowledge of comparable rates charged by lawyers in the district,' as well as on 'evidence proffered by the parties.'" *JTRE Manhattan Ave. LLC v. Cap. One, N.A.*, No. 21-cv-05714 (JLR), 2024 WL 4880075, at *3 (S.D.N.Y. Nov. 25, 2024) (quoting *Adorno v. Port Auth. of N.Y. & N.J.*, 685 F. Supp. 2d 507, 511 (S.D.N.Y. 2010)).  The analysis is ultimately "case-specific," and courts "consider a variety of factors in assessing the reasonableness of a rate, including what are known as the *Johnson* factors." *Id.* (citation omitted).  The *Johnson* factors include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorneys' customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the

amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Lilly v. City of New York*, 934 F.3d 222, 228 (2d Cir. 2019). The Court is not required to "recite and make separate findings as to all twelve *Johnson* factors, provided that it takes each into account into setting the attorneys' fee award." *JTRE Manhattan*, 2024 WL 4880075, at *3 (citation omitted).

The *Johnson* factors overall favor Plaintiff's proposed fee award. Proceedings in this matter have lasted approximately three years, and the parties litigated the case through summary judgment and a bench trial. Rappaport therefore necessarily exerted substantial time and effort in prosecuting this action, a factor that weighs in favor of his requested fees. Moreover, more than 150 hourly-rate clients have agreed to pay Riemer Hess the requested rates, *see* Riemer Aff. ¶¶ 15-17, and Riemer Hess specializes in high-stakes ERISA litigation and is highly regarded in the legal community and by their clients, *see id.* ¶¶ 11-13; Dkt. 153-2 ¶ 15.

On the other hand, the rates charged appear to be unreasonably high compared to other experienced ERISA partners and associates in this District. *Graziano v. First Unum Life Insurance Co.*, cited by Guardian, is particularly instructive because it considered fees charged by the same firm, indeed by a near-identical legal team from that firm, just last year. *See* 2024 WL 1175143, at *2. The court acknowledged Riemer Hess's experience and the fact that its clients were willing to pay similar rates to the ones at issue here, but concluded that the proposed rates were unreasonably high after considering the prevailing rate for ERISA litigators in this District. *Id.* at *3. The court reduced the rates by 10 percent to "bring the proposed rates closer to the prevailing market rates in the relevant community

approved in ERISA cases in this District," but noted that the rates were "still above the rates found to be reasonable in other recent ERISA cases" because of Riemer Hess's "reputation . . . , the experience of the attorneys and paralegals, and the nature and caliber of the work performed." *Id.*

Here, Rappaport's proposed fee award already incorporates a voluntary across-the-board reduction of 10 percent. Fees Br. at 18. The Court finds this reduction, which parallels that imposed by the *Graziano* court, to be appropriate.

### B. Reasonably Expended Hours

Having determined the reasonable rates for each timekeeper, the Court next considers whether the hours expended were reasonable. When evaluating the reasonableness of hours billed, courts must make "a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended." *Haley v. Pataki*, 106 F.3d 478, 484 (2d Cir. 1997) (quoting *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994)). "[T]he critical inquiry is 'whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.'" *Samms v. Abrams*, 198 F. Supp. 3d 311, 322 (S.D.N.Y. 2016) (quoting *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992) (per curiam)). "Hours that are excessive, redundant, or otherwise unnecessary, are to be excluded, and in dealing with such surplusage, the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) (internal quotation marks and citation omitted). To make this determination, a court reviews "contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done." *Id.* at 173.

The Court has reviewed the time entries submitted by Rappaport and deems them nonduplicative and reasonable, despite Guardian's objections. Rappaport has properly itemized the tasks undertaken by his counsel and provided sufficient detail and clarity to confirm the reasonableness of the work performed. The case was efficiently staffed, as a single senior associate handled most of the work. *See* Riemer Aff. ¶ 61 (table illustrating total time spent by each Riemer Hess attorney and paralegal). Over the last three years, Riemer Hess litigated discovery disputes, a motion for summary judgment, bench trial briefing, and a first bench trial. In addition, Guardian moved to amend its answer and add a new affirmative defense after summary judgment briefing had concluded in light of the Supreme Court's decision in *Loper Bright*, implicating novel legal questions and requiring additional briefing. Considering the complex legal issues involved, the number of motions, and the duration of this litigation, the Court finds the hours expended by Rappaport's attorneys reasonable.

### C. Reasonableness of Costs

Rappaport also seeks $3,144 for costs, including for the filing of the Complaint, transcript fees for the first bench trial and depositions, and printers and messengers. Fees Br. at 18. Since Rappaport has "been found eligible for a fee award," he is "also eligible for reimbursement of [his] reasonable out-of-pocket expenses associated with this lawsuit." *Algie v. RCA Glob. Commc'ns, Inc.*, 891 F. Supp. 875, 898 (S.D.N.Y. 1994). However, Rappaport did not submit any invoices, receipts, or documentary proof for the proposed costs, and has submitted instead a "Costs Chart" listing itemized expenses as an attachment to the Riemer Declaration. Dkt. 153-6 at 67. With this record, the Court cannot confirm that these costs were incurred, with the exception of the $402 filing fee reflected on the docket. *See Guidice ex rel. Tr. for I.B.E.W. Loc. 1049 Craft Annuity Fund v. All Reliable Servs.*, No. 23-cv-07575 (NJC) (JMW), 2025 WL 745908, at *16 (E.D.N.Y. Jan. 26, 2025) (noting that "the burden of

adequately documenting and itemizing the costs requested" falls on the party seeking costs (quoting *Datiz v. Int'l Recovery Assocs., Inc.*, No. 15-cv-03549, 2020 WL 5899881, at *14 (E.D.N.Y. Mar. 12, 2020))), *report and recommendation accepted as modified*, 2025 WL 521144 (E.D.N.Y. Feb. 18, 2025); *see, e.g.*, *Douyon v. NY Med. Health Care, P.C.*, 49 F. Supp. 3d 328, 352 (E.D.N.Y. 2014) (costs award was inappropriate where movant "failed to submit any invoices, receipts, or documentary proof for any of the proposed costs"). Courts have approved reimbursement of similar filing fees in ERISA actions, *see, e.g.*, *Mason Tenders Dist. Council Welfare Fund v. LJC Dismantling Corp.*, No. 17-cv-04493 (VSB) (SN), 2020 WL 9600111, at *13 (S.D.N.Y. Dec. 14, 2020), *report and recommendation adopted*, 2021 WL 1988069 (S.D.N.Y. May 17, 2021). Thus, the Court will grant the request for reimbursement of the filing fee for the Complaint in the amount of $402.00, but otherwise denies Rappaport's motion for costs.

## CONCLUSION

During the first bench trial, the Court found that the Plan definition of "insured earnings" includes Plaintiff's K-1 income at ICC. After a second and final bench trial, the Court additionally finds that Guardian is entitled to a set off against its obligations to pay LTD benefits to Plaintiff after January 22, 2021, in the amount of $97,297.72.

Therefore, the Court directs the Clerk of Court to enter judgment as follows:

1. Rappaport is entitled to judgment on his claims in Counts I and II that "insured earnings," as used in the Plan, includes Plaintiff's K-1 earnings from ICC and/or that the Plan should be reformed to so provide;

2. Rappaport is granted attorneys' fees and costs in the amount of $461,402.78 in fees and $402.00 in costs; and

3.  Guardian is granted judgment in its favor on its counterclaim for set off because
    Guardian overpaid LTD benefits to Plaintiff in the amount of $97,297.72 prior to
    January 22, 2021.

The Court DENIES Rappaport's motion to strike.  The Clerk of Court is respectfully
directed to terminate the motions at Dkts. 150 and 176, and to close the case.

Dated:  September 22, 2025
        New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge